## HANNAH L. AMIDON *vs.* LUCIAN HARRIS & others.

A., being tenant by curtesy of a house, entered into an indenture with B., the owner of a spring and of an aqueduct leading therefrom, which, after reciting that A. was desirous of obtaining the right of using the water upon his premises, provided that he, his heirs and assigns, might draw from the aqueduct *as much water as might be necessary* for the supply of the families resident in the house, as long as water should run from the spring through the aqueduct. After A.'s death his heirs conveyed this right to his widow, who continued to reside in the house. In an action by the widow to enforce the right, *Held*, that the indenture conveyed an easement in gross which could be conveyed by the heirs and enforced by an assignee residing in the house.

A., the owner of a dwelling-house, entered into an indenture with B., the owner of a spring and of an aqueduct leading therefrom, in which B., after a recital that it was his intention to dispose of privileges to use the water, covenanted that A., as long as water should run from the spring through the aqueduct, might draw as much water from the aqueduct as should be necessary for the supply of the persons living in his house. B. subsequently sold so many rights to draw from the aqueduct that A. was deprived of necessary water. In a suit in equity brought by A. to enjoin B. and his assigns from diminishing A.'s supply, *Held*, that B. could not dispose of privileges to take water to such an extent as to interfere with the supply of persons living in the house of A.

BILL IN EQUITY against Lucian Harris, Mary A. Harris, his wife, and Harriet Bugbee.

The bill alleged that the plaintiff was seised in fee of a lot of land with a dwelling-house upon it lying between the mansion-house which once belonged to one Charles Negus, deceased, and a lot called the spring lot, which was also once his property,

that Negus sunk a well upon the spring lot; that this well was supplied by a spring which furnished water abundantly sufficient to supply the wants of Negus's estate and of some six other estates in the vicinity; that Negus constructed an aqueduct and conveyed water from the well to his house, and that Negus and the plaintiff's husband, Rufus Amidon, who was then seised of a life estate as tenant by the curtesy in the plaintiff's land, and who had since died, executed the following indenture:

" This indenture made and executed this 1st day of January, A. D. 1849, by and between Charles Negus, of Webster, in the county of Worcester and Commonwealth of Massachusetts, physician, of the one part, and Rufus Amidon, of the same Webster, of the other part, Witnesseth:

" That whereas the said Negus, being the owner of a certain spring of water situated in said Webster, has brought and is still bringing water therefrom by means of an underground pipe running from said spring to the premises now occupied by him in said Webster, and whereas it is his intention to dispose of privileges to use said water so conveyed as aforesaid, to such individuals as may desire to purchase the same : And whereas the said Amidon is desirous of obtaining the right of using the said water upon the premises of him the said Amidon, situate in said Webster : Now, therefore, the parties hereto have mutually covenanted and agreed as follows, to wit:

" First. The said Negus, for himself, his heirs and assigns, doth covenant and agree to and with the said Amidon, that he, the said Amidon, his heirs and assigns, may at any and all times hereafter, so long as water shall run from said spring through said pipe as aforesaid, draw from the main pipe of said Negus, at a point agreed upon by the parties, so much water as shall be necessary for the supply of the family or families resident in the house now owned by said Amidon.

" Second. And the said Amidon doth hereby covenant and agree to and with the said Negus, that he will pay to the said Negus for the right of water so granted to him as aforesaid, the sum of fifty dollars, to be paid upon the execution of this instrument, and that he will, and his heirs and assigns shall, pay his or

their proportion of any and all expenses which may hereafter accrue for the repair of the main pipe, the whole of said expenses to be proportionately borne by all those who shall use the said water; that is to say, that at each and every time that the main pipe shall become out of repair, the expense of repairing the same shall be divided into as many equal parts as there may be houses supplied with water from said main pipe, and the owner of each house shall pay one part.

" Third. And the said Amidon for himself, his heirs and assigns, doth further covenant and agree to and with the said Negus, his heirs and assigns, that he or they will lay down and keep in repair at his or their own proper cost and charge a branch pipe leading from said main pipe to the house of said Amidon; that he and they will use the said water so granted as aforesaid in an economical manner, and not suffer the same to be uselessly wasted or extravagantly expended.

" In witness whereof, the parties have hereunto set their hands and seals, the day and year first above written.

" Charles Negus.     [L. S.]

" Rufus Amidon."   [L. S.]

The bill then alleged that the plaintiff was, by conveyance from the heirs of her husband, the owner of the right granted to him by this indenture; that her husband laid a branch pipe from the main pipe to her house; that she and her husband drew from the pipe all the water necessary for the house; that they had always paid their proper proportion of the expense of repairing the main pipe; that Negus afterwards granted similar rights to take water to six other persons; that there was always abundance of water for the plaintiff and the six other grantees; that Negus devised his mansion-house estate to the defendant Mary A. Harris; that the spring lot had by conveyances (which were set forth in the bill) become the property of the defendant Lucian Harris; that Lucian and Mary Harris had empowered the defendant Bugbee and others, who owned estates situated upon a lower level than the plaintiff's estate, to extend the main pipe to their estates, and had thus enabled them to draw water from the spring when the plaintiff and the other grantees of Negus

were suffering from its want; that for four months before the filing of the bill the plaintiff had been almost wholly deprived of water, and had been obliged to obtain a supply elsewhere; that she had called upon the defendants to desist from the unlawful taking of the water, but that they had refused, and had threatened to continue the taking. The bill prayed for an injunction and for general relief.

The defendants demurred generally, for the want of equity.

*H. B. Staples*, for the defendants. The right granted to draw water from the main pipe was an easement appurtenant to the life estate of Rufus Amidon and ceased on its termination. *Hoffman* v. *Savage*, 15 Mass. 130. An easement in gross is never to be presumed when it can be fairly construed to be appurtenant. Washb. on Easements, c. 2, § 1, par. 5. Ib. c. 1, § 3, par. 2. Several considerations show that this was an easement appurtenant. The right granted is to be presently enjoyed in the house in which the grantee has a freehold estate, through a branch pipe, which he agrees to construct. In the grant the grantee expresses a desire to obtain the right of "using the said water upon the premises of him the said Amidon." The house where the water is to be used is described as "the house now owned by said Amidon," and the object of its acquisition is defined, "the supply of the family or families resident" therein. The expense of repairing the main pipe is to be proportionally borne by the owners of the houses supplied with the water. It is inconsistent with the intent and situation of the parties and the recitals and provisions of the grant itself, to regard this easement as attached to the person and not to the estate, making it necessary for the grantee afterward to acquire the right to possess the house in order to annex the easement for the purposes of enjoyment. *Goodrich* v. *Burbank*, 12 Allen, 459. If it be said that the easement appurtenant granted to the life tenant attached to the land so as to pass to the owner of the fee, the answer is, there was no privity between the grantor and such owner. It is a well known principle, that an easement appurtenant to land passes by a grant of the land, though not mentioned in the deed. Suppose the grant is of a life estate, the

duration of the easement is measured by it. The plaintiff takes nothing by the deed of the heirs of her husband, if the easement sought to be granted was not in gross.

The defendant Harris had the right to lease to Bugbee the right to take water, even if the supply of the complainant was partially 'cut off thereby. The phrase in the original grant to Amidon, " so much water as shall be necessary for the supply," &c., is not a measure of the quantity. granted, but a restriction on its use by the grantee. The grantor reserves, by fair implication, the right to make further grants of water rights at his pleasure. In the grant the grantor declares it his intention to dispose of water rights to such as may desire to purchase the same, without any limit. The expense of repairing the main pipe in all future time is charged to all " who shall use the water," the same to be divided into as many parts " as there may be houses supplied with water." The subsequent grants to six other persons are admitted in the bill to be within a fair construction of the grant, when in fact it could not be known that the plaintiff's supply of water would not thereby be impaired.

*P. E. Aldrich*, for the plaintiff.

ENDICOTT, J. This indenture conveyed to Rufus Amidon, his heirs and assigns, the right to draw and take so much water from the main pipe running from the spring to the mansion-house of Charles Negus, as was or should be necessary for the supply of the families resident in the house described as owned by Amidon. This right was to continue so long as the water should run from the spring through the main pipe. At the date of the indenture Amidon did not own the premises on which the house stood, but occupied them with his wife, the present plaintiff, who then as now held them in fee in. her own right. The defendants, who own the estate of Negus,. subject to all the rights conveyed to Amidon, contend that the indenture conveyed an easement appurtenant to the estate of Amidon in the premises ; and that, as his estate expired with his life, so did the easement.

But we do not think this the true construction of the indenture, or that such was the character of the interest conveyed. The indenture conveys an easement in gross to take a certain

amount of water from the pipe. It was assignable and inherit-able, to him, his heirs and assigns, and the use was restricted to the particular house now occupied by the plaintiff. Such a right may be conveyed without being restricted to a particular locality; and its character is not changed by reason of a restriction in that respect. A man may purchase such right restricted in its use to a particular house, or to a particular purpose, as for run-ning a mill, although he may not own the house or mill; he may do this in contemplation of owning or of building a house or mill, and when he does so, the easement to take the water be-comes annexed to the house or mill, or in other words may be availed of to the extent granted. Amidon not owning the fee, and the grant being to him, his heirs and assigns, affords a pre-sumption that it was not intended to terminate the easement with his estate in the premises, but that it was intended it should pass to his heirs and assigns, who could enjoy it only so far as they could properly and legally annex it to the premises. The conveyance of the easement by the heirs of Amidon to the plain-tiff gives her the power of enjoyment, and she can enforce any rights to the water which Amidon could have enforced. *Goodrich* v. *Burbank*, 12 Allen, 459. *Lonsdale Co.* v. *Moses*, 21 Law Re-porter, 658, 664. *Hankey* v. *Clark*, 110 Mass. 262.

The easement being created by indenture with mutual cove-nants binding upon the heirs and assigns of both parties, the party entitled to enjoy it at the place designated may maintain an action for its disturbance. For all purposes of enjoyment and of maintaining the right to enjoy, it is annexed to the plaintiff's estate, and is a charge upon the lands of the defendants. *White* v. *Crawford*, 10 Mass. 183, 188. *Bowen* v. *Conner*, 6 Cush. 132, 137. It is too well established to require an extended considera-tion of the authorities, that a grantor has no right to derogate from his own grant, and that there is always an implied covenant that he will do no act to interfere with, prevent or diminish the full enjoyment of the right granted. *Dexter* v. *Manley*, 4 Cush. 14. It is misfeasance in a grantor to defeat the grant by a vol-untary act on his part. The distinction was taken in an early case between the disturbance on the part of a grantor, by his own

act, of an easement conveyed by him, and an alleged failure on his part to do some act, which not being done, the easement became worthless. As where the grantor of a way or a watercourse, or the right to draw water at a pump, cannot stop the way or the watercourse, or remove or destroy the pump, but is not bound to keep them in repair. *Pomfret* v. *Ricroft*, 1 Saund. 321. By such act the grantor attempts to exercise control over the then thing granted, in derogation of his grant, in violation of the implied covenant that the grantee may enjoy it as against him. As when one covenants that another shall have a certain amount of wood annually, and the covenantor destroys all the wood, an action lies against him. And when a lessee covenanted that at the seasons for burning lime he would supply the lessor with lime at a certain price, it was held there was an implied covenant that he would burn lime at all such seasons, and that it was no defence that at one season no lime was burned, so that the lessor could not be supplied. *Shrewsbury* v. *Gould*, 2 B. & Ald. 487. *Sampson* v. *Easterby*, 9 B. & C. 505. *Saltoun* v. *Houstoun*, 1 Bing. 433.

Applying these principles to the present case, it is clear, in the absence of a distinct provision to the contrary, that there is an implied covenant in the first, second and third clauses of the indenture, that Amidon, his heirs and assigns, shall have the right, as long as the water runs in the main pipe, to draw a sufficient supply for the families occupying the house of the plaintiff, without any disturbance by Negus or those claiming under him. The words, " so much water as may be necessary for the supply," &c., &c., are not to be construed as merely a restriction on its use by the grantor, as contended by the defendants. They determine the extent of the use, apply to the grantor as well as the grantee, and indicate the measure of the rights of both parties. While the grantee may not use more than is required for the supply of the house, the grantor cannot limit or restrict the supply below that quantity. The words of a covenantor, or of a grantor, are to be construed more strictly as against himself. If by any act of Negus, or those claiming his estate, the supply is stopped or materially diminished, an action will lie. Nor is it necessary that

the act should be done by the owner in person.   It is no less the
act of the owner, when done by another acting under his permis-
sion or authority; and the granting permission by an oral agree-
ment to Bugbee to draw the water as alleged, and thereby to
deprive the plaintiff of the enjoyment of the easement, is a breach
of the covenants of the indenture by the defendants.

But the defendants contend that, even assuming this to be the
law, there is a recital in the preamble which, properly construed,
enables them to grant similar privileges without limit, what-
ever may be the consequences to the plaintiff.   In the preamble
Negus recites that "it is his intention to dispose of privileges
to use said water so conveyed as aforesaid to such individuals as
may desire to purchase the same."   It is not necessary to con-
sider how far these words of recital in the preamble can control
the covenants, which are necessarily implied from the express
covenants entered into by the grantor in the main body of the
instrument, because we do not think they have the meaning con-
tended for, or were intended as a reservation to the grantor to
the extent of impairing the privilege of the grantee and dero-
gating from and making worthless his grant, which is elsewhere
given in clear and decisive words.   The right of Negus to sell
similar privileges to others is not derived from this recital in the
preamble.   He has that right independently of the in lenture to
sell all that he had not therein granted.   He need not give notice
of this to his grantee; he sells to him a limited quantity, and may
sell and dispose of the surplus as he pleases.   The statement was
not made to reserve anything to himself, but evidently for another
purpose.   At the close of the second clause, Amidon agrees to
pay his proportion of the cost of repairing the main pipe, with
others who may have similar privileges to use the water with
him.   Amidon being the first grantee, it was proper, in order to
make this provision intelligible, that the preamble should state the
facts that other similar privileges were to be conveyed, and that
when conveyed, each house should bear one part of such expense.
This provision for keeping in repair has also a strong bearing
upon, and indicates the understanding of the parties that the
benefits derived from the conveyance by Amidon were not to be

diminished by the later conveyances; for it cannot be presumed from doubtful words inserted in a preamble, that Amidon would covenant to keep the main pipe in repair, in connection with other grantees, if the grantor could by increasing the number indefinitely render his grant worthless. This seems to have been the practical construction put upon the agreement by the parties in the lifetime of Negus, as he made similar conveyances to seven persons only, the last of which was made in 1856, and there was sufficient water for all, until the permission was given to Bugbee to take the water.

We think, therefore, the bill can be maintained, if the plaintiff can establish the facts set forth.          *Demurrer overruled.*