JOSEPH STONE & others *vs.* CHARLES J. PILLSBURY
& others.

Suffolk.    December 7, 1896. — January 8, 1897.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Deed — Restriction — " Single Dwelling-house " — Evidence.*

If a building is maintained as a single dwelling-house, without structural change,
either inside or outside, from its original construction, but is used also as a
private institution for the treatment of persons suffering from the liquor habit
and kindred habits, who are boarded and lodged there while undergoing treat-
ment, such use cannot be said to be a violation of a restriction in the deed by
which the land was conveyed, that " no building other than one single dwelling-
house . . . shall be . . . maintained on said lot."

Evidence as to the meaning of the words "single dwelling-house" among real
estate men, is inadmissible at the hearing of a bill in equity to restrain an alleged
violation of a restriction upon the use of an estate, it not appearing that the
original or subsequent purchasers of the property were dealers in real estate.

BILL IN EQUITY, filed April 11, 1895, against Charles J.
Pillsbury, Dana T. Bennett, Henry J. Vrooman, Dennis Tracy,
Jr., and others not material to be named, to restrain an alleged
violation of a certain restriction upon the use of real estate.
Hearing before *Lathrop*, J., who reported the case for the con-
sideration of the full court, in substance as follows.

The real estate in question was a part of what was formerly a
large tract of land situated in that part of Boston called Rox-
bury, formerly belonging to one Horatio Harris, and known as
the Harris estate.   Harris, some time between 1855 and 1860,
built a large dwelling-house upon the tract, and the house was
and is known as the Harris homestead.   In 1887, Harris having
died, his heirs divided the tract of land into building lots, ac-
cording to a general plan, and the lots were placed upon the
market for sale.   Down to the time of the bringing of this suit a
number of the lots had been sold, and all were sold subject to
the restriction hereinafter set forth, which was placed upon the
lots for the common benefit of all ; and a blank form of deed
was printed containing the restriction.

In 1889, the Harris homestead was sold to one Moody Merrill,

and afterwards, by mesne conveyances, in 1894, to the defendant Pillsbury.

The lot on which the Harris homestead stood contained at the time of the conveyance to Pillsbury about 35,000 square feet of land. The deed to Merrill was on one of the printed forms, and contained the following restriction printed in the form: " This conveyance is made subject to the restriction that until January 1, 1900, no building other than one single dwelling-house, to cost not less than six thousand (6,000) dollars, and the structures usually appurtenant thereto, including a private stable, shall be erected, placed, or maintained on said lot"; and the conveyance to the defendant Pillsbury was made subject to the same restriction.

In the latter part of 1894 the premises in question were leased, or subleased, to the defendants Vrooman and Tracy, who occupied them at the time this bill was brought, and are still occupying the same.

The defendants Vrooman and Tracy were, at the time the bill was brought, and still are, carrying on in the Harris homestead, as partners, under the name of the Baker-Rose Gold Cure Company of Massachusetts, an institution for the treatment and cure of persons suffering from the liquor, opium, morphine, cocaine, and tobacco habits. The house in question has not been altered in construction, either inside or outside, since the institution took possession thereof. It has, however, been fitted up so that twenty or more patients may be boarded and lodged there. As many as seventeen patients at one time have been boarded and lodged there while undergoing treatment, and the length of time required for the treatment is three, four, or five weeks, as the case may be. The average number of patients boarding and lodging in the house is about ten. Besides these patients there are six servants, and the families of the defendants Vrooman and Tracy.

The patients are persons suffering from one of the above mentioned habits, and are treated daily by the defendant Vrooman for the purpose of curing the habit. Vrooman treats no other patients than those boarding and lodging in the house and taking the so called cure. There is no sign on the outside of the premises denoting the business carried on therein, and Vrooman has no sign displayed in any way.

Vrooman and Tracy have advertised for patients in a magazine called " The Bostonian," by circulating a large number of advertising cards and pamphlets through the mails, and by means of travelling agents, who have solicited business in different sections of the State.

Joseph Stone, one of the plaintiffs, testified that he lived in a house upon one of the lots into which the original tract was divided, distant about one hundred and sixty feet from the Harris homestead; that since the " gold cure " moved in he had seen a great number of very undesirable people around the Harris homestead, hanging about the neighborhood and walking about; that there had also been quite a number of disturbances in the neighborhood; that he had been very much disturbed in his house by people calling to know where the " gold cure " was; that there had been shouting in the neighborhood by people apparently not in their right minds; that he had talked with the defendant Bennett when the " gold cure" first moved in, and had told Bennett that action would be taken to put a stop to the use of the house as a " gold cure "; and that he had received one of the pamphlets and one of the cards before referred to from some of the neighbors. On cross-examination, he testified that the house in question was, when it was built, one of the most expensive houses in Boston; that the other houses around there were houses costing ten or fifteen thousand dollars in addition to the land; that he should say that houses costing eighteen or twenty thousand dollars in addition to the value of the land had been put up in that neighborhood; and that people had been in his house making inquiries about the " gold cure," he should say, thirty or forty times.

Francis Todd, called by the plaintiffs, testified that he was in the real estate business, and lived in a house on land which was part of the original Harris estate; that he had noticed a great many people about the Harris homestead since the Gold Cure Company moved in there, and it was lighted up very late at night, and people were making more or less disturbance about the grounds around it, and on the streets and in his neighborhood; that he had noticed these people smoking, walking up and down the sidewalk near his house, and sitting on the walls, and generally killing time; that last fall there was a disturbance

at five o'clock in the morning, and he was awakened by shouting and calling for help; that a man was ringing the door bells and begging for assistance, as a man would naturally be who was losing his senses after drink; that finally some of the assistants came from the Harris house and carried him back there; that as a real estate broker he was acquainted with the value of land in Roxbury in the vicinity of the Harris homestead; and that in his opinion the fact that a " gold cure " establishment was carried on there injured the surrounding property forty or fifty per cent. On cross-examination, he testified that he did not notice any signs or anything on the outside of the Harris estate which would indicate that the " gold cure " was being carried on there.

L. Foster Morse, called by the plaintiffs, testified that he was a real estate broker and dealer, and acquainted with real estate values in the immediate vicinity of the Harris homestead; that in his opinion the effect upon the market value of the surrounding land by reason of the " gold cure " being carried on within the Harris homestead was very detrimental; that it was generally known that a " gold cure " establishment was being carried on there; that he had charge of selling the Harris property; and that he had not been able to sell any in the vicinity since the " gold cure " was established there.

George E. Westcott, called by the plaintiffs, testified that he was manager of the Gold Cure Company from January 1, 1895, to June, 1895. On cross-examination, he testified that there were all classes of people at the cure.

John F. Newton, Jr., called by the defendants, testified that he was a real estate broker, and familiar with the Harris estate; that he did not think the estates in the neighborhood of the Harris estate had been affected by the carrying on of the " gold cure " business in the Harris homestead; that he thought a private stable immediately in the rear of the homestead had done more to hurt the value of property in that immediate vicinity than anything else; that there were no signs, not even a door-plate, on the door of the Harris homestead; that he thought building had increased in that immediate vicinity; and that he had never noticed anything objectionable about the use of the property in question.

Dennis Tracy, Jr., called by the defendants, testified that he was the partner of the defendant Vrooman, carrying on the "gold cure" business on the Harris estate; that they never had had any disturbance since he had been there; and that no changes or alterations had been made in the house.

The plaintiffs offered to show, by the testimony of the witnesses Todd and Morse, that the words "single dwelling-house" have a technical meaning among real estate men; and that such technical meaning is a dwelling-house for the use of one family only. The judge excluded this testimony; and the plaintiffs excepted.

The judge entered a decree dismissing the bill, with costs. If the decree was right, it was to be affirmed; otherwise, an injunction was to issue, perpetually restraining the defendants Vrooman and Tracy from using, and the defendant Pillsbury from leasing, the premises as a "gold cure" establishment; or such disposition of the case was to be made as equity and justice might require.

*G. D. Burrage*, for the plaintiffs.

*C. E. Hellier*, for the defendants.

ALLEN, J. The defendants contend, in the first place, that the restriction was not intended to apply to the house already upon the lot, but only to houses which might be built in the future. If this were so, the plaintiffs would be without remedy if the house were to be considerably changed in its interior construction, and converted into a hotel for transient guests, a public eating-house, a liquor shop, or a factory. We should be slow to give this construction to the deed.

But on other grounds we do not see our way clear to give to the plaintiffs the relief which they seek. The house was built and occupied as a single dwelling-house by its original owner. Since then, it has not been altered in construction, either inside or outside. So far as its mode of building goes, it remains a single dwelling-house. We do not determine whether any possible change in the manner of its use would be a violation of the restriction. It might, for example, be wholly given up as a residence, and used only for some purpose of trade. But its use as a residence continues, with some approach also towards a use as a private hotel or a private hos-

pital.   The words of the restriction are not very strong.   They do not say that no building upon the granted land shall be used for any other purpose than as a private residence for a single family without boarders; or even that no building shall be used otherwise than as a single dwelling-house.   The provision, omitting words not now material, is that no building other than one single dwelling-house shall be maintained on said lot.   So far as the material structure is concerned, no other building is maintained there.   No doubt the present use is such as might reasonably have been provided against, if it had been anticipated. But the words are not plain.   While a reasonable interpretation is to be given to them, doubts are to be resolved in favor of the grantee in the deed.   *Saltonstall* v. *Long Wharf*, 7 Cush. 195, 201.   *Simonds* v. *Wellington*, 10 Cush. 313.   *Thayer* v. *Payne*, 2 Cush. 327, 331.   *Johnson* v. *Jordan*, 2 Met. 234, 240.   *Amidon* v. *Harris*, 113 Mass. 59, 65.   *Grubb* v. *Grubb*, 101 Penn. St. 11. In some decided cases the limitation upon the use of the building has been clearly expressed.   Of these, *Dorr* v. *Harrahan*, 101 Mass. 531, is an example.   In *Gillis* v. *Bailey*, 21 N. H. 149, the limitation upon the use was clearly to be inferred from the detailed recital of the object of imposing the restriction.   In the present case the inference is less clear, and, the building itself being maintained as a single dwelling-house, without structural change, we are unable to say that the introduction of the use which is described is a violation of the restriction.   See *Hutchinson* v. *Ulrich*, 145 Ill. 336.

The evidence as to the meaning of "single dwelling-house" amongst real estate men was rightly excluded, it being limited to a particular class which, so far as appears, did not include the original or subsequent purchasers of this property.

*Decree affirmed.*