DAVIS *v.* ROBINSON.

———————

R. J. DAVIS ET AL., SUING ON BEHALF OF THEMSELVES, AND ALL OTHER PARTIES OWNING LOTS IN PIEDMONT PARK, IN THE CITY OF CHARLOTTE, WHO MAY COME IN AND BE MADE PARTIES PLAINTIFF, v. FRANK E. ROBINSON ET AL.

(Filed 6 May, 1925.)

**1. Deeds and Conveyances—Restrictions—Development Companies—Evidence.**

Conveyances of land by an improvement company from a plat ·of the original purchase in large acreage, divided into lots showing reserved streets with certain parks laid off, with restrictions in the deeds given for a large number of the lots sold as to the erection of residences only of a certain class or at a certain price in the printed and written conveyance, and without these restrictions by like conveyances as to other lots scattered through 'the development, is not sufficient to evidence a mutual mistake of the parties in failing to incorporate the restrictions in all of the deeds, enforceable in a court of equity.

**2. Same—Equity—Injunction.**

*Held,* under the facts of this case, that a mesne purchaser of a lot of land conveyed by a deed restricting the use of lots to residential purposes cannot maintain his suit in equity for injunctive relief against the erection of a business building, a filling station for automobiles, against a purchaser under a deed .containing no restrictions as to the use of the lot he has purchased.

**3. Same—Easements—Statute of Frauds—Subsequent Purchaser—Registration.**

Where the owner of certain lots in a land development has acquired title by deed with others restricted as to the erection of dwellings, and claims this right against other purchasers whose deeds do not contain this provision, the right so claimed is that of a negative easement, required by the Statute of Frauds to be in writing (C. S., 988), and as against subsequent purchasers for value, their prior registration is required to establish the right. C. S., 3309. The acquisition and incidents of easements discussed by VARSER, J.

APPEAL by plaintiff from *Shaw, J.,* of MECKLENBURG.

Action by R. J. Davis and others, on behalf of themselves, and all other parties owning lots in Piedmont Park, in the City of Charlotte,

who may come in and be made parties plaintiff, against Frank E. Robinson and others, including J. M. Haralson and Keely A. Grice, partners, as "D. H. & G. Service Stations." Judgment for defendants, and plaintiffs appealed. Affirmed.

The plaintiffs alleged that they owned certain parcels of land in a development known as "Piedmont Park," now in the city of Charlotte; that they purchased these parcels under deeds containing restrictions "against the erection of any structure except houses to be used for residential purposes only, costing certain amounts therein mentioned, and necessary outhouses."

Piedmont Park was originally an eighty-six-acre tract of land, purchased by F. C. Abbott in 1900. A corporation, Piedmont Realty Company, was formed, and this land conveyed to it and then developed into lots, streets and avenues; and a map showing lots, blocks, streets, avenues and alleys was made and spread upon the records in the office of the Register of Deeds for Mecklenburg County.

After conveying to purchasers 129½ lots (121½ with and 8 without restrictions), the Piedmont Realty Company conveyed to F. C. Abbott, without restrictions, 136½ lots. Another corporation, Suburban Realty Company, was then organized, and it took the title to the 136½ lots without any restrictions in its titles. The first conveyance of lots by the Piedmont Realty Company was in October, 1900, and its last in April, 1909, when it conveyed to Gustav Oelkers the *locus in quo,* without restrictions, and a residence had been erected thereon by the Piedmont Realty Company.

At the time of the aforesaid conveyance to F. C. Abbott by the Piedmont Realty Company, 117½ lots had been conveyed to sundry purchasers by the Piedmont Realty Company with restrictions, and 6 lots had been so conveyed without restrictions.

The Suburban Realty Company made maps of its said purchase and other added blocks, and spread same on record in the office of the Register of Deeds of Mecklenburg County. The Suburban Realty Company conveyed all the F. C. Abbott 136½ lots and 40 other lots added by it thereto from other contiguous lands, referring to its map and subject to restrictions, practically the same as those contained in the Piedmont Realty Company deeds.

Before *Piedmont Realty Company* conveyed the *locus in quo* to Gustav Oelkers, both of said realty companies had conveyed to sundry purchasers 164½ lots by deeds with restrictions and 142½ lots by deeds without any restrictions whatever.

Certain deeds called secondary conveyances by the parties, because they were quit-claims, corrective deeds, releases and reconveyances, were executed, some with and some without restrictions.

These restrictions, in so far as they are material, provided: That no owner of said real estate shall, at any time hereafter, erect upon said real estate any structure except a dwelling-house which shall cost not less than a specific amount, and no owner shall permit any building erected thereon to be used for other purposes than dwelling and necessary outhouses.

"The party of the first part reserves to itself all parks, streets and avenues, laid out on the map aforesaid, with the right to dispose of same as it may see fit, provided, however, that no alley or street over which the right of way is expressly granted herein shall be closed or materially altered; and the party of the first part reserves to itself all of the rights and easements appurtenant to the said property known as Piedmont Park which are not herein expressly granted."

Some of the plaintiffs hold by mesne conveyances under the Piedmont Realty Company and the others by mesne conveyances under the Suburban Realty Company.

The defendant, F. E. Robinson, holds the *locus in quo* by mesne conveyances under the Piedmont Realty Company through Gustav Oelkers, and in his chain of title no restrictions appear. And defendants, Haralson and Grice, hold by lease under defendant Robinson. The defendants, Haralson and Grice, leased a part of the *locus in quo* for use as a "filling station." They desired to sell gasoline and other merchandise used in operating automobiles. The plaintiffs instituted this action for injunctive relief against this business enterprise and to have declared effective against the *locus in quo* the restrictive negative easements, or covenants applying to their lots, as set out in their deeds. They alleged that the restrictive provisions were omitted from these deeds by inadvertence, or the mutual mistake of the parties to the first conveyance from the Piedmont Realty Company, and that each subsequent grantee took with notice and full knowledge of this omission. .

They further alleged that the whole development of Piedmont Park was the result of a "general scheme or plan" to preserve and maintain "Piedmont Park" as a strictly residential community or neighborhood. The defendants denied these allegations and pleaded the express provisions of plaintiffs' deeds and their own deeds, and that they were purchasers for value, without notice or knowledge of any such rights of the plaintiffs as against them. They further alleged that the registered conveyances themselves *negatived* any general purpose to restrict the lots in Piedmont Park, for that many were sold without restrictions, and that the unrestricted lots were so scattered as to evince a lack of any general plan to restrict all the lots in their use.

Davis *v.* Robinson.

The plaintiffs offered the testimony of F. C. Abbott: That he is a real estate dealer in Charlotte of some 27 years experience, and that he, with others, bought the property now called Piedmont Park for the purpose of development—then organized the Piedmont Realty Company, a corporation, and conveyed this land to it; that he had a scheme or plan for its development as a residential section, except that they were supposed to have a community store on lot No. 1, in block 20, and all the remainder was to be residential. That the Piedmont Realty Company had a deed printed to carry out this plan containing these restrictions; that he was connected with the Piedmont Realty Company until the latter part of 1905. Abbott and Stephens were selling agents for this property. Whenever this question was raised with purchasers that he told them that it was limited to residential uses, except the store corner lot—the restriction is a valuable property right; that he repurchased all the unsold lots of the Piedmont Realty Company, 29 January, 1906. The deed from Piedmont Realty Company to F. C. Abbott conveyed 136½ lots in Piedmont Park, and was not made on the printed forms, and contained no restrictions or reservations; that, for the purpose of turning these over to a new company to proceed with the same development, he organized the Suburban Realty Company and deeded the entire property to them a few days after his deed from the Piedmont Realty Company, which deed contained no restrictions or reservations. He said it was his purpose to convey this property to the Suburban Realty Company and continue to develop or sell the lands according to the original plan he had first adopted by the sale of lots for the Piedmont Realty Company. A new deed was printed for the Suburban Realty Company, containing practically the same restrictions as in the printed form of deed used by the Piedmont Realty Company. That lots Nos. 1 and 2, in block 8, purchased by Gustav Oelkers, constituted a most important approach to this entire property, and that the Piedmont Realty Company built on this property, in 1903 or 1904, under his supervision, a good residence, and had the yard graded, shrubbery set out according to a landscape architect, and had a hedge around the property; this hedge surrounded both lots. Piedmont Realty Company sold its last lot in Piedmont Park some time in 1924. "As far as I knew, I gave to Dr. Austin the same facts I did to other buyers." The Austin deed from Piedmont Realty Company contains this restriction: "It is understood and agreed also that the first building to be erected on lot No. 1 shall be a dwelling-house, costing not less than $1,500.00." The deed from Piedmont Realty Company to F. C. Abbott, October, 1900, not on printed form, but contains the following restrictions: "It is to be further understood and agreed that

38—189

the lots fronting on Central Avenue and Seventh Street are to be used for residential purposes only." Witness built his residence on one of these lots.

Another deed was executed to the Louise Mills, with no restrictions in it.

D. L. Probert, for plaintiffs, testified that it was represented to him that this was to be a residential district, with a store on one of the corners to supply the needs in that section; that such representation was an inducement to him to buy a lot and use it for a home. He further testified that the "filling station" is operated every day in the week and later than 10 o'clock at night, including Sunday, and to other objectionable phases as to the "filling station." That the Piedmont Grocery Company is less than 300 feet from Sugar Creek and the building near the store is sometimes used as a meat market.

C. I. Myers, for plaintiffs, testified that notice was given to defendant Robinson before' anything was done toward putting a "filling station" on the lot in controversy, and that the coming and going of the cars and glare of the lights disturbed the community and affected the property. The Robinson house still is on the *locus in quo,* but Robinson has moved.

J. D. Biggers testified that he lived just across Seventh Street from the "filling station," and that he was acquainted with the property in controversy before the "filling station" was constructed and the effect of the "filling station" on the use of the other property.

J. T. Moore likewise testified that notice was given before the "filling station" was begun that the property was for residential purposes.

The testimony of the foregoing witnesses was offered subject to the Court's opinion as to its competency. At the close of the plaintiff's evidence, the trial court was of the opinion that the evidence of these witnesses tending to prove that Piedmont Park was established for the purpose of making it a residential section and that the purchasers of the property were notified of the purpose of the owner and promotion; and that testimony tending to show conversation with the defendant Robinson after he purchased the property, in which the defendant said he thought his property was restricted, was not competent, and the court allowed defendant's motion to strike it out. The trial court was further of the opinion that, notwithstanding any plan or purpose that may have been had or formed for the Piedmont Realty Company or the Suburban Realty Company in the development of Piedmont Park, that the plaintiffs' right to maintain this action is dependent 'upon the restrictions and reservations in the deed under which each of' them claims, and that under the restrictions and conditions set out

in the deeds under which plaintiffs claim, the plaintiffs are not entitled to maintain this action. The motion to nonsuit was allowed. Plaintiffs excepted to these rulings and appealed from the judgment of nonsuit.

*Cansler & Cansler, D. E. Henderson and John H. Small, Jr.,* for plaintiffs.
*McNinch, Whitlock & Dockery and W. S. Beam* for defendants.

VARSER, J. The plaintiffs seek injunctive relief to prevent the use of the lands purchased by the defendant Robinson through mesne conveyances from the Piedmont Realty Company for other than residential purposes. There are no restrictive covenants or stipulations in the defendants' chain of title from the common source, the Piedmont Realty Company. Plaintiffs' deeds contain such restrictive covenants.

The plaintiffs first base their contention upon an alleged mutual mistake or inadvertence, whereby the restrictions appearing in their chain of title were omitted from the defendants' chain of title. The evidence offered by the plaintiffs is totally insufficient to establish an agreement between the Piedmont Realty Company and Gustav Oelkers to limit the use of the *locus in quo* to residential purposes only. In fact, no evidence whatever is offered tending to show what transpired in that transaction. The Piedmont Realty Company sold a large number of lots with restrictions and a large number of lots to F. C. Abbott without restrictions, and Abbott conveyed these lots to the Suburban Realty Company without restrictions. The unrestricted lots are so scattered as to negative this contention. There could have been no inadvertence in omitting these restrictions from the defendants' chain of title, unless there was the intent on the part of both parties to the original purchase, as well as knowledge or a like intent on the part of the mesne grantees to insert these restrictive covenants in the conveyances. The very essence of the doctrine allowing relief from inadvertence, or mutual mistake, is the desire of the law to effectuate the original intent and agreement of the parties. Story's Equity Jurisprudence (13 ed.), sec. 115; Bispham's Principles of Equity (6 ed.), 598, sec. 468. When this common intent is absent, the reason ceases. Reason is the soul of the law, and when the reason of any particular law ceases, so does the law itself. Broom's Legal Maxims (8 ed.), 159.

The plaintiffs' next contention is that Piedmont Park is the result of a general plan or scheme of development of an exclusive residential community, and that such scheme was so well known and so basic in its relation to the development that all purchasers took their titles subject

thereto, and that it would now be unconscionable to allow some to use their lots unrestrictedly, while others were restricted to residential purposes.

It appears from the record that a large number of lots were conveyed by the Piedmont Realty Company by primary conveyances without. restrictions, and by deeds of trust without restrictions, and that these were registered prior to the sale of the *locus in quo.* Two lots had been released from the restrictions in order that a grocery store might be erected and maintained. No covenants appear in any deeds from the Piedmont Realty Company or the Suburban Realty Company registered prior to the defendants' deeds that, like restrictive covenants, would be inserted in all other deeds made by either of these companies. The Piedmont Realty Company's deeds, which contained the residential restrictions, also contained a provision that "the party of the first part did reserve to itself all of the rights and easements appurtenant to the said property known as Piedmont Park 'which are not herein expressly granted.' " This provision is notice that all rights and easements not expressly granted in each particular deed was held by the Piedmont Realty Company and would not pass to other subsequent purchasers by implication. The grantor reserved to itself the free and unrestricted use, and right, of alienation of its unsold property. It is significant in the instant case that there is no covenant in the plaintiffs' deeds that all other conveyances will contain similar restrictive covenants.

"A general building.scheme for an entire tract is not shown, where, although the original proprietor makes conveyances of portions of such tracts subject to restrictions, he also conveys large portions of it free from any restrictions whatever." 18 C. J., 395; *Donahoe v. Turner,* 204 Mass., 274; *Saylor v. Podoliski,* 82 N. J. Eq., 459.

"Where the original proprietor of a tract of land made conveyances of portions of it subject to certain restrictions, but also conveyed portions of it free from any restrictions whatever, the facts do not warrant a finding that a general building scheme founded on such restrictions was adopted for the entire tract." *Donahoe v. Turner, supra.*

In *Milliken v. Denny,* 141 N. C., 224, the Court says: "If purchasers wish to acquire a right of way or other easement over other lands of their grantor, it is very easy to have it so declared in the deed of conveyance. It would be a dangerous invasion of rights of property, after many years and after the removal by death or otherwise of the original parties to the deed and conditions have changed, to impose by implication, upon the slippery memory of witnesses, such burdens on land."

We find it against the weight of authority to construe the covenants in the instant case as plaintiffs contend.

Davis *v*. Robinson.

In *Shoonmaker v. Heckscher,* 157 N. Y. Supp., page 77, the Court says: "An owner of real property has an unquestionable right to restrict its uses by covenant or agreement, and such restrictions will be upheld by the courts, provided they are reasonable and not contrary to the public welfare, and effect will be given to the intention of the parties, as shown by the words used, considered in connection with the surrounding circumstances. But if, when so considered, the language used is reasonably capable of two constructions, the one that limits, rather than the one that extends, the restrictions should be adopted, for the reason that the law will always favor the free and unrestricted use of property, and, therefore, all doubts and ambiguities must be resolved in favor of the natural right to the free use and enjoyment of property and against restrictions. *Clark v. Life Ins. Co.,* 64 N. Y., 33; *Clark v. Jammes,* 33 N. Y. Supp., 1020; *Kitching v. Brown,* 180 N. Y., 414; *South Church v. Bldg. Co.,* 148 N. Y. Supp., 519; *Hutchinson v. Ulrich,* 145 Ill., 336; L. R. A., 21, 391; *Duyn v. Chase & Co.* (Iowa), 128 N. W., 300; *James v. Irvine,* 141 Mich., 376; *Walker v. Renner,* N. J. Eq., 493; *Cengor v. Railway,* 120 N. Y., 29; *Richter v. Distelhurst,* 101 N. Y. Supp., 634; *Stone v. Pillsbury,* 45 N. E., 768. In this latter case, the Court, speaking to provisions in conveyances restricting the use of the property conveyed, says: "While a reasonable construction is to be given to them, doubts are to be resolved in favor of the grantee in the deed."

In *Underwood v. Herman* (N. J.), 89 Atl. Rep., 21, the Court says: "It is well settled that, in cases where the right of a complainant to relief by the enforcement of a restrictive covenant is doubtful, 'to doubt is to deny.' " . . . Courts of equity do not aid one man to restrict another in the uses to which he may put his land, unless the right to such aid is clear. *Newberry v. Barkalow,* 75 N. J. Eq., 128; *Walker v. Renner,* 60 N. J. Eq., 493; *In re Walsh* (Mass.), 55 N. E., 1043; *James v. Irvine* (Mich.), 104 N. W., 631; *DeGray v. Monmouth Beach Club House,* 50 N. J. Eq., 329; 7 R. C. L., 1115.

Land is becoming more and more an object of daily commerce, and its uses are changing with the varying needs and wants of society. Inventions and new wants reflect themselves in the uses of land, and it is for the best interest of the public that the free and unrestricted use shall be enjoyed, unless such use is restricted in a reasonable manner consistent with the public welfare. The construction of deeds containing such restrictions or prohibitions as to the use of lands by the grantees, in the case of doubt, as a general rule, ought to be strict and in favor of a free use of such property and not to extend such restrictions. This doctrine is clearly established in the foregoing authorities and forcibly expressed in *Hutchinson v. Ulrich, supra.*

Plaintiffs' prayer for injunctive relief presupposes an easement in favor of their lots and a servitude in the defendants' lots.

An easement is an incorporeal hereditament, and is an interest in the servient estate. *Mackey v. Harmon*, 24 N. W., 702; *Clawson v. Wallace* (Utah), 52 Pac., 9.

Black's Law Dictionary, 408, says: "A right in the owner of one parcel of land, by reason of such ownership, to use the land of another for a special purpose not inconsistent with a general property in the owner," is an easement. Expressed conversely, the same author says: "It is a privilege which the owner of one adjacent tenement hath of another, existing in respect of their several tenements, by which that owner against whose tenement the privilege exists is obliged to suffer or not to do something on or in regard to his own land for the advantage of him in whose land the privilege exists. A private easement is a privilege, service, or convenience which one neighbor has of another. "Easements are classified as affirmative or negative. Negative easements are those where the owner of a servient estate is prohibited from doing something otherwise lawful upon his estate, because it will affect the dominant estate." Black's Law Dict., 409; 2 Washb. Real Prop., 301; Tiffany on Real Property (2 ed.), 1199; *Nash v. Shute*, 182 N. C., 528.

Easements are, again, either appendant, appurtenant or in gross. "An appurtenant easement is one which is attached to and passes with the dominant tenement as an appurtenance thereof, while an easement in gross is not appurtenant to any estate in land or not belonging to any person by virtue of his ownership of an estate in land, but a mere personal interest in, or right to use the land of another." Black's Law Dict., *supra; Cadwalader v. Bailey*, 17 R. I., 495; *Pinkum v. Eau Claire*, 81 Wis., 301; *Stovall v. Coggins Granite Co.*, 116 Ga., 376; Mordecai's Law Lectures, Vol. I, 469. Easements appendant and appurtenant are always owned in connection with other real estate and as incidents to such ownership; while easements in gross are purely personal and usually end with the death of the grantee. However, an easement in gross designated as a *profit a prendre*, by which the right to take something from the land does not end with the death of the grantee necessarily, but may pass to his heirs or assigns. Mordecai's Law Lectures, *supra; Council v. Sanderlin*, 183 N. C., 253. The differences between easements appendant and appurtenant are not material to the instant case.

The nine ways in which easements may be created are set out in Mordecai's Law Lectures, 464, as follows: "Grant, Estoppel, Way of Necessity, Implication, Dedication, Prescription, Ancient Window Doctrine, Reservation, and Condemnation."

DAVIS *v.* ROBINSON.

As said by this learned author, and our Court in *Lindley v. Bank,* 115 N. C., 553, the easement of light and air, sometimes called the "Ancient Window Doctrine," does not apply in this State.

The Statute of Frauds, as enacted in C. S., 988, requires "all contracts to sell or convey any lands, tenements or hereditaments, or any interest in or concerning them . . . to be put in writing and signed by the party to be charged therewith or by some other person by him thereto lawfully authorized."

In the instant record there appears no writing evidencing the negative appurtenant easement which the plaintiffs seek to establish and enforce against the defendants. Since the plaintiffs have not come within the equitable jurisdiction of the court to correct the conveyances so as to include such easements, there is admittedly no writing which can evidence any agreement or contract creating such an easement. An easement, being a hereditament, is expressly included within this statute. The easement sought, on account of its negative character, seeks to impose a servitude on the defendants' lot. This servitude is a species of incorporeal right derived from the civil law corresponding to the easement "of the common law," except that servitude has relation to the burden on the estate burdened, while easement refers to the benefit or advantage of the estate to which it accrues. If we adopt the terminology of the civil law, this negative easement would be a negative servitude which restrains the owner of the servient estate from making a certain use of his property which would impair the easement belonging to or enjoyed by the dominant tenement. Black's Law Dict. (2 ed.), 1077; *Rowe v. Nally,* 81 Md., 367; *Los Angeles Terminal Land Co. v. Muir,* 136 Cal., 36; *Laumier v. Francis,* 23 Mo., 184. While conveyances of real estate are within this statute, a conveyance of any interest in or concerning the same is, as well, included. *Hall v. Misenheimer,* 137 N. C., 186; *Drake v. Howell,* 133 N. C., 165; *Presnell v. Garrison,* 121 N. C., 366; *Buckner v. Anderson,* 111 N. C., 577; and this language includes, necessarily, an easement both as a hereditament and as an interest in or concerning land or a hereditament. *Herndon v. R. R.,* 161 N. C., 650; *Kivett v. McKeithan,* 90 N. C., 106; *McCracken v. McCracken,* 88 N. C., 272. *Milliken v. Denny, supra,* says: "It is elementary learning laid down in all of the books and adjudged cases on the subject that an easement may be acquired either by grant or dedication or prescription." Prescription is based upon a presumption that a grant was once issued, and there is no claim of dedication to public use in the instant case. In *Hammond v. Schiff,* 100 N. C., 161, *Chief Justice Smith* says: "While an easement is not transferred at law, for want of a seal to the instrument necessary for that purpose,

the contract, as executory, has, in equity, when acted on, a force and efficacy little short, if any, of an easement or right of support to the wall for the security of the adjacent premises."

At law, it was necessary for an easement to be created by a writing under seal, a deed; but a writing now under seal would create the right which could be enforced in equity to compel either the performance or the conveyance of the easement contracted for. Hence, in this jurisdiction, where law and equity are administered by the same court and in the same case, these distinctions are not material to the instant case. *Cagle v. Parker,* 97 N. C., 273, 274, states: "An easement can be created by a conveyance under seal or by long user from which such a conveyance is presumed to have been made." *Herndon v. R. R.,* 161 N. C., 650, 654. An estate in real property: Appeal of R. R. Co., 32 Cal., 506; *Atlantic R. R. Co. v. LeSneur* (Ariz.), 19 Pac., 157. In this latter case the Court says: "We have never seen the principle here stated doubted." "An easement always implies an interest in the land. It is real property and it is created by grant." Washburn on Easements, 5; *Long v. Mayberry* (Tenn.), 36 S. W., 1040. This case holds that a verbal contract for a right of easement is void under the Statute of Frauds. *Nunnelly v. Sou. Iron Co.* (Tenn.), 29 S. W., 361, 365; *Parker v. Meredith* (Tenn.), 59 S. W., 167; *Cadwalader v. Bailey, supra; Trustees v. Lynch,* 70 N. Y., 440; 26 Am. Rep., 615, 619, holds a negative easement by which the owner of land is restrained in its. use can only be created by covenants in favor of other lands not owned by the grantor or covenantor. *Hills v. Miller,* 3 Paige, 254; *Tise v. Whitaker-Harvey Co.,* 144 N. C., 508, holds that an unregistered paper-writing agreeing to give the privilege of using an alley or driveway is insufficient, both as a dedication to the public or as a grant of a private way, and that such an effect is shut off by the *prior registration of defendants' deed. Kivett v. McKeithan, supra; Norfleet v. Cromwell,* 64 N. C., 1. This latter case, together with *Blount v. Harvey,* 51 N. C., 186, hold that an easement may be created by a covenant, although such covenant does not contain words of a grant, if the intention is clear, and that this may appear from the context.

A further discussion of easements and the manner of their creation and their effect in "running with the land" appears in *Parrott v. R. R.,* 165 N. C., 295, 300, and cases therein cited.

An equitable interest in lands is within the Statute of Frauds. *Holmes v. Holmes,* 86 N. C., p. 208; *Maxwell v. Wallace,* 45 N. C., 251; *Simms v. Killian,* 34 N. C., 252; *Rice v. Carter,* 33 N. C., 298.

Negative easements are within the Statute of Frauds and cannot be proved by parol. *Ham v. Massasoit Real Est. Co.* (R. I.), 107 Atl., 205.

A building restriction is a negative easement. *Hennen v. Deveny,* 77 S. E., 142; 71 W. Va., 629.

He who purchases land *with notice* that a restrictive negative easement has been created by which the land he purchases is charged with a negative servitude in favor of such other lots restricting its use, and when such restrictions are not against public policy or the general welfare, he will be held to take subject to them. *Wood v. Stehrer* (Md.), 86 Atl., 128. In this case, *Chief Justice Boyd* ably and clearly sets forth the rulings, both English and American.

In the instant case, while the record does not disclose the creation of any easement in favor of the plaintiffs' lands restricting use of the defendants' lands, and since such agreement, if existent, would be within the Statute of Frauds, and, therefore, required to be evidenced by some writing, there is another fatal defect in plaintiffs' case. Under C. S., 3309, all such conveyances of an interest in land to run for more than three years is required to be registered in the county where the land lies, in order to constitute notice to creditors and purchasers for a valuable consideration. *Thompson v. Blair,* 7 N. C., 583; *Johnson v. Prairie,* 91 N. C., 159; *Justice v. Baxter,* 93 N. C., 405; *Smith v. Fuller,* 152 N. C., 7; *Wood v. Tinsley,* 138 N. C., 507; *Brewington v. Hargrove,* 178 N. C., 143.

The wisdom embodied in the Connor Act has clearly demonstrated itself in the certainty and security of titles in this State, which the public has enjoyed since the first day of January, 1886, when this act went into effect.

It is necessary in the progress of society, under modern conditions, that there be *one place* where purchasers may look and find the status of titles to land. Therefore, our courts have held many times since this act went into effect that "no notice, however full and formal, will supply the place of registration." *Austin v. Staten,* 126 N. C., 783; *Fertilizer Co. v. Lane,* 173 N. C., 184; *Wood v. Lewey,* 153 N. C., 401; *Harris v. Lumber Co.,* 147 N. C., 631; *Blalock v. Strain,* 122 N. C., 283; *Buchanan v. Clark,* 164 N. C., 71; *Hinton v. Williams,* 170 N. C., 117; *Blacknall v. Hancock,* 182 N. C., 372.

Upon the instant record we see no reason, either in law or equity, to disturb the judgment of nonsuit entered by the learned and careful judge who tried the case below. Therefore, let the judgment appealed from be

Affirmed.