## CHAPMAN, SECRETARY OF THE INTERIOR, *v.* SHERIDAN-WYOMING COAL CO., INC.

No. 60.   Argued January 9, 1950.—Decided February 6, 1950.

*Roger P. Marquis* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Vanech, Wilma C. Martin* and *John C. Harrington.*

*T. Peter Ansberry* argued the cause for respondent. With him on the brief were *Stephen J. McMahon, Jr.* and *Seth W. Richardson.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

This action by a lessee of coal-mining rights in public lands seeks to prevent leasing of similar rights in other lands to a competitor. The case is before us only on pleadings. The original complaint was dismissed by the District Court on several grounds but the Court of Appeals affirmed only on the ground that the complaint showed no standing to sue, there being no allegation of special injury to any property right of plaintiff. *Sheridan-Wyoming Coal Co.* v. *Krug,* 83 U. S. App. D. C. 162, 168 F. 2d 557. It gave leave to apply to the District Court to amend in this respect. The District Court denied the privilege, however, holding that the proposed new matter added nothing material, and that amendment would be idle and needlessly prolong the litigation. This, we think, was equivalent in effect to sustaining a demurrer to the amended complaint and requires us to treat well-pleaded facts as true. On this basis, the Court of Appeals reversed and, in substance, held that the amended complaint does state a cause of action. 84 U. S. App. D. C. 288, 172 F. 2d 282. We granted certiorari. 338 U. S. 810.

The hypothesis on which the legal issues are to be decided is this:

At all relevant times the following regulation, promulgated by the Secretary of the Interior, has been in effect:

*"Showing required that an additional coal mine is needed.* The General Land Office will make favorable recommendation that leasing units be segregated and that auctions be authorized only in cases where there has been furnished a satisfactory showing that an additional coal mine is needed and that there is an actual need for coal which cannot otherwise be reasonably met." 43 CFR 1938, § 193.3.

It originated in 1934, when the coal industry was demoralized by excess production capacity described in opinions of this Court. *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 361; *Carter* v. *Carter Coal Co.,* 298 U. S. 238, opinion of Cardozo, J., 324, 330; *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 395. The policy which the Department embodied in this regulation, and to which it has since adhered, was stated in letters of the Secretary set forth in the margin.[1]

---

[1]                          "EXHIBIT 'A'

"EXCERPT FROM LETTER OF JANUARY 24, 1934, FROM THE SECRETARY OF THE INTERIOR TO THE DIRECTOR OF THE BUREAU OF GEOLOGICAL SURVEY.

"The question of the advisability of withholding new leases of coal lands of the United States has been presented to me.

"It is clear from the language of section 2 of the leasing act of February 25, 1920 (41 Stat. 437), and from the interpretation given to Section 13 of that act, relating to oil and gas, by the Supreme Court in the case of *United States* v. *Wilbur,* 283 U. S. 414, that it is within the discretionary authority of the Secretary of the Interior whether he shall issue any coal leases and coal prospecting permits. In the present situation of the coal industry it is desirable that very few, if any, new coal leases or prospecting permits be issued.

"Taking into consideration, however, that there may be some cases where new small coal mines for local needs are advisable and that there may also be cases where leases for shipping mines should not be denied, it is thought that no general order should be issued in effect suspending the operation of the leasing act as to new coal leases and prospecting permits. It is believed that substantially the

In September, 1943, the Sheridan-Wyoming Coal Company leased additional lands located in Wyoming for coal-mining purposes from the Government and, "in reliance upon the Regulation," has expended large sums in development and built up a prosperous business in the rather low-grade coal mined and largely consumed in that region.

In December, 1943, the Big Horn Company applied for a lease of nearby lands for production of competitive coal, and in 1945 applied for additional lands. Meanwhile Big Horn already had established mines on partially exhausted state-owned lands and desired the federal lands to prolong its business. The Sheridan-Wyoming Company, among others, protested on the basis of the regulation. The protest, after hearings, was overruled and,

same result can be reached by declining to offer coal lands for lease or to grant prospecting permits unless an actual need for coal which cannot otherwise be reasonably purchased or obtained is shown. . . .

"Hereafter the offering of coal lands for lease by competitive bidding or the granting of prospecting permits should not be recommended unless you have reliable information that there is an actual need for coal which cannot otherwise be reasonably met."

"Exhibit 'B'

"Excerpt from Letter of January 24, 1934, from the Secretary of the Interior to the Commissioner of the General Land Office.

"In the present situation of the coal industry it is desirable that very few, if any, new coal leases or prospecting permits be issued.

"Taking into consideration, however, that there may be some cases where new small coal mines for local needs are advisable and that there may also be cases where leases for shipping mines should not be denied, it is thought that no general order should be issued in effect suspending the leasing act as to new coal leases and prospecting permits. It is believed that substantially the same result can be reached by declining to offer coal lands for lease or to grant prospecting permits unless an actual need is shown for coal which cannot otherwise be reasonably purchased or obtained. . . .

"It is advisable that you in the first instance require lease applicants to show fully the need for additional production of coal."

unless prevented, the Secretary will lease to Big Horn. The Secretary has made no finding that there is need for any additional supply of coal and, in fact, there is no such need. If he leases to Big Horn, the two companies will have capacity to produce in excess of the demand for that grade of coal in the limited market. The investment of Sheridan-Wyoming will be substantially impaired and its volume of sales decreased and profitable markets lost. About these three ultimate facts—the regulation, the lease and the threatened lease to a competitor—the parties have argued several intricate and interesting questions as to the standing of the plaintiff to sue, whether the suit really is one against the United States without sovereign consent and whether the Secretary has abused his power in entertaining the application of Big Horn. These questions we do not need to discuss because of the view we take of more fundamental aspects of the case. We think the facts give rise to no cause of action, because the proposed lease does not breach any contract right or invade any property right of plaintiff and does not violate any law. Hence, the leasing is within the discretionary power of the Secretary and courts will not review its exercise.

## I. CONTRACT RIGHTS.

The court below has sustained the complaint for the principal reason that a lease to Big Horn would breach the lease to plaintiff and that plaintiff has a property right to have the lands involved withheld from lease.

It is only on this basis of its property rights, created by contract, that plaintiff has been held to have standing to sue; for, if it has such rights, the court below truly said, "The prevention of a breach of a restrictive provision in a contract is one of equity's most usual functions." Credited with "the status of one claiming a property right by contract, threatened with invasion," the plaintiff has been termed by the Court of Appeals "possessor of

a valuable right, created by contract in the presence of valid and binding restrictive regulations."

Of course, no express covenant of plaintiff's lease restricts the Secretary from leasing other lands to other applicants. The restrictive covenant is sought to be supplied by implication. The lease, it is reasoned, was expressly made subject to the Mineral Lands Leasing Act, 41 Stat. 437, as amended, 30 U. S. C. §§ 181 *et seq.;* the lease constructively includes the statute; the regulation which was not referred to in the lease nevertheless had the force and sanction of statute; hence, the restrictive regulation was a covenant of the lease. It is said the threatened lease would violate the regulation. For the purpose of testing the contract-right theory, we shall assume that it does so.

What is the contract property right assumed? It is a right to nondevelopment of coal reserves in an indeterminate but substantial part of the public domain for benefit of its own lease. It is not a right necessary to the fullest physical development and enjoyment of all the lands plaintiff acquired for itself, and is one not normally appurtenant to real estate. The assumed covenant is purely negative in character and its whole burden is upon other premises owned by the United States in which the plaintiff has no other interest. They are premises, moreover, in which it is doubtful whether plaintiff could lawfully acquire any other interest in view of the limited areas which the statute allows to one lessee. By the assumed covenant, alienation and utilization of public lands in the manner authorized by Congress is restricted. This is for an unstated and indeterminable period. And it is accomplished not by a covenant expressed in the lease itself, but by one read into it from the regulations.

A competent grantor by appropriate covenants could, of course, convey the right claimed here, and equity would enforce it. But when a right "consists in restraining the

owner from doing that with, and upon, his property which, but for the grant or covenant, he might lawfully have done," it is an easement, sometimes called a negative easement, or an amenity. *Trustees* v. *Lynch,* 70 N. Y. 440, 447. "An equitable restriction," which prevents development of property by building on it, has been said to be "an easement, or servitude in the nature of an easement," a "right in the nature of an easement," and an "interest in a contractual stipulation which is made for their common benefit." Such "equitable restrictions" are real estate, part and parcel of the land to which they are attached and pass by conveyance. *Riverbank Improvement Co.* v. *Chadwick,* 228 Mass. 242, 246, 117 N. E. 244, 245. A contractual restriction which limits the use one may make of his own lands in favor of another and his lands is "sometimes called a negative easement, which is the right in the owner of the dominant tenement to restrict the owner of the servient tenement in the exercise of general and natural rights of property." It is an interest in lands which can pass only by deed and is in every legal sense an incumbrance. *Uihlein* v. *Matthews,* 172 N. Y. 154, 158, 64 N. E. 792, 793.

But whatever we might determine to be the technical nature of the collateral property right claimed to result from Sheridan's lease, to any extent that it added a property right to the plaintiff's lands it created an incumbrance or subtraction from the aggregate of rights in the United States. Courts would not lightly imply against any land owner a covenant which would restrict alienation or enjoyment of his estate. There are even stronger reasons against implied covenants imposing easements, servitudes, amenities or restrictions upon the public lands.

The Mineral Lands Leasing Acts confer broad powers on the Secretary as leasing agent for the Government. We find nothing that expressly prevents him from taking into consideration whether a public interest will be served or

injured by opening a particular mine. But we find no grant of authority to create a private contract right that would override his continuing duty to be governed by the public interest in deciding to lease or withhold leases.

The leasing Acts strictly limit the area which any one lessee may acquire, either directly or indirectly. 30 U. S. C. § 184. But if, in taking up a permitted allotment of public lands, one may acquire a right that other areas far more extensive must lie fallow and unused for the benefit of his lands, he is acquiring an interest in prohibited lands and an interest that may be worth many times that interest which the statute allows him. And it is acquired without additional purchase price, rental, or royalty.

Moreover, it is not denied that the effect of sustaining plaintiff's suit would be to create a monopoly. Of course, it is a little one, limited to low-grade coal and to an advantageous shipping zone. Big Horn, if it gets no lease, must eventually go out of business, leaving its customers to Sheridan. And the United States could not for some period—we do not know how long—admit any other competitor to the field, unless it can be shown that Sheridan's supply is not equal to the market. It may, however, continue to acquire additional reserves as its own approach exhaustion. The whole claim of damage here is that competition from Big Horn will impair this snug little monopoly of the market to which plaintiff thinks it has acquired a property right.

But the policy of the leasing statute looks the other way. Besides limiting the leasehold of any one lessee, it prevents mineral rights, on pain of forfeiture, from passing into the hands of any unlawful trust or becoming the subject of any contract or conspiracy in restraint of trade. 30 U. S. C. § 184. Its whole policy seems to contemplate the opening of the public domain to competitive exploitation. It nowhere authorizes anyone to grant or to obtain

exclusive rights of access to these coal resources. What lessees can acquire from the Government is a supply of coal, not an exclusive market. We do not say that the Secretary may not withhold, or by regulation provide for withholding, lands from lease because the public interest would be injured, through impairing private business, from excess production capacity. But we find no authority to freeze this public interest into an irrevocable private property right.

The allegations of the amended complaint therefore do not show a cause of action to enforce a restrictive covenant or property right against leasing other public lands as authorized by statute.

## II. VIOLATION OF LAW OR REGULATION.

Since the District Court was overruled by the Court of Appeals only because of the latter's property rights theory and since the complaint without these allegations had earlier been held insufficient, it may be questioned whether other grounds to sustain the judgment below can be availed of. But even if the allegations fail to show a property right that equity will protect, they might be sufficient to show a special injury or interest, such as would enable plaintiff to raise the question of violation of law or regulation in the proposed leasing. To end a litigation already pending too long, we assume, without deciding, that plaintiff may raise this issue which we now consider.

The only claim of law violation is that the Secretary is proposing to violate his own regulation, promulgated pursuant to the Act and hence having the force of law. That it binds him as well as others while it is in effect is not doubted.

The regulation on literal reading does not purport to prohibit the Secretary from any leasing unless need for new mines be shown. It does direct the General Land

Office (now the Bureau of Land Management) to find need for additional capacity before recommending new leasing. Its recommendation, however, is only advisory and can be overruled or disregarded. On its face, therefore, the regulation would seem to be directed primarily to a procedural matter within the Department of the Interior. However, it is claimed that the letters of Secretary Ickes at the time it was adopted and the uniform practice since, show it to have been a regulation fixing a controlling policy. We proceed on that assumption.

In the case before us the Secretary neither repudiates the regulation nor stands upon any right to depart from it. He says that, properly construed, it does not apply to the proposed Big Horn lease. It only prevents a lease which will introduce a new competitor to the field and not, he says, a lease which would only enable an existing mine and an established business to continue. Sheridan argues that this reasoning sanctions an evasion of the regulation in that Big Horn opened its mine on partially depleted state lands knowing it must get federal lands also or quit. The implication is that state lands were used as a sort of portal in which to stand while prying a federal lease out from under the regulation. Plaintiff insists that the Secretary is required to act in the light of conditions when Big Horn first applied, and not as of now when it has built up a going business on the inadequate state leases, aided by war conditions.

But the action is one in equity, and "equity will administer such relief as the exigencies of the case demand at the close of the trial." *Bloomquist* v. *Farson,* 222 N. Y. 375, 380, 118 N. E. 855, 856; *Lightfoot* v. *Davis,* 198 N. Y. 261, 273, 91 N. E. 582, 586. The question on injunction is whether the action threatened will be a violation if it now takes place in light of conditions shown by the proposed amended complaint. That pleads findings of the Department which show what has hap-

pened since the Big Horn application was filed. Without recourse to federal lands, it has established a mine and a business in the face of Sheridan competition. If time has improved Big Horn's position in this respect, it must be noted that the delay in acting on its application has been largely due to plaintiff's protests and litigations.

We think a court of equity cannot term unreasonable the view of the Secretary that Big Horn's lease is not for "an additional coal mine," need for which must be proved. It does not use federal reserves to add a new competitor to the market. It uses them to keep one there. We think the distinction is substantial and the Secretary's interpretation of the regulation is permissible, even if not inevitable. The declining market following the war and the growing use of oil may present difficult problems of survival for government lessees and of fair dealing for the Secretary. But courts can intervene only where legal rights are invaded or the law violated.

We think the District Court rightly concluded that the amended complaint fails to state a legal case for the relief asked. Accordingly, the judgment below is

*Reversed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.