**UNITED STATES of America, Plaintiff,**

**v.**

**CERTAIN LAND IN the CITY OF AUGUSTA, COUNTY OF KENNEBEC, STATE OF MAINE, and the Roman Catholic Bishop of Portland, et al., Defendants.**

**Civ. No. 7–103.**

United States District Court
D. Maine, S. D.
July 8, 1963.

Alton A. Lessard, U. S. Atty., William E. McKinley, Asst. U. S. Atty., Portland, Me., for plaintiff.

Richard B. Sanborn, Augusta, Me., for defendant.

GIGNOUX, District Judge.

This is a proceeding by the United States of America for the condemnation of certain land in Augusta, Maine for the construction of a post office. The property condemned consists of certain numbered lots, owned by the Roman Catholic Bishop of Portland, Maine, and certain other land designated as a "Pond," owned by M. Haynes Wheeler, all as shown on a recorded plan of a residential development known as "Glenmere." The compensation claims of the Roman Catholic Bishop of Portland and M. Haynes Wheeler have both been settled. The present claimants, Aline E. Anthony, Sidney S. Anthony, Helen F. Bragg and Bessie B. Stevens, are the owners of other numbered lots on the "Glenmere" Plan adjacent to the property condemned. They have filed an answer to the complaint, in which they claim an interest in the land taken by the government by virtue of valid restrictive covenants in favor of the lots owned by them that the lots taken by the government be used only for residential purposes. For the destruction of their rights under these covenants, they assert that they are entitled to compensation. No land of these claimants was actually taken in the condemnation.

At pre-trial conference, the parties agreed that prior to a jury trial on the is-

sue of just compensation, the following legal issues should be resolved by the Court on the basis of a stipulation of facts, briefs and oral argument:

I. Whether or not the claimants had a compensable interest in the land taken in this proceeding by virtue of the restrictive covenants in their deeds.

II. Whether or not, if the claimants had a compensable interest in said premises, the measure of the just compensation to which they are entitled in this proceeding is the diminution in value of claimants' adjoining premises.

III. Whether or not the so-called "Pond" area as shown on the "Glenmere" Plan was dedicated as a pond for the benefit of the numbered lots shown on the Plan.

The stipulation of facts discloses the following situation: In 1933, the original owners of all the property in question laid out and platted a plan of "Glenmere," which was duly recorded in the Kennebec County Registry of Deeds. The development borders on Sewall Street and Western Avenue in Augusta, and consists of 18 numbered lots, an entrance roadway, and an area designated "Pond." By separate deeds in 1936, the then owners of the entire tract, Hope Haynes Wheeler and Muriel Sturgis Haynes, conveyed Lots 16, 17 and 18 to the claimant Helen F. Bragg; Lot 6 to the claimant Aline E. Anthony; [1] and Lot 5 to the claimant Bessie B. Stevens. With the exception of the deed to Lot 18 and to the southerly half of Lot 16, which contained no restrictions, all of these deeds contained substantially the following restrictions:

"No dwelling or other principal building shall at any time be placed on said lot costing less than Five Thousand ($5000) Dollars, and no building or erections thereon shall be used for commercial or industrial purposes. All buildings erected on said lot shall be placed at least twenty (20) feet back from the front line thereof."

In 1947, Hope Haynes Wheeler and Muriel Sturgis Haynes conveyed the remaining numbered lots on the "Glenmere" Plan to the Roman Catholic Bishop of Portland, subject to the following restrictions:

"It is mutually agreed between the grantors and the grantee herein that no dwelling or other buildings shall be erected upon the premises above described during the lifetime of the grantor, Hope Haynes Wheeler.

"It is further mutually agreed that at no time shall the premises herein conveyed, or any buildings or erections thereon be used for commercial or industrial purposes, and that all buildings erected on said lots shall be placed at least twenty feet back from the front line of said lots."

By complaint filed in the Kennebec County Superior Court in December, 1959, the Roman Catholic Bishop of Portland sought to have the restrictions in his deed declared "to be cancelled, destroyed, removed and of no further force and effect" because of a material change in the character of the neighborhood in which "Glenmere" is located, which he alleged to have become substantially devoted to commercial and business purposes. Named as defendants in this complaint were Mrs. Bragg, Mrs. Anthony, Mrs. Stevens and M. Haynes Wheeler, the owner of the "Pond" area shown on the Plan. Following a hearing, Chief Justice Williamson of the Supreme Judicial Court of Maine, sitting as a single justice, entered a decree in July, 1961, dismissing the complaint and stating, "Said premises of the plaintiff are subject to valid restrictive covenants, or so-called equitable easements, in favor of the premises of said three defendants,[2]

---

1. Lot 6 was subsequently conveyed to Aline E. Anthony and Sidney S. Anthony in October, 1961.

2. The complaint as against M. Haynes Wheeler was dismissed without prejudice.

who have *property rights* that said premises of the plaintiff be not used except for residential purposes." (Emphasis added.) No appeal was taken from this decree. The present taking followed on July 13, 1962, a year after the entry and recording of Chief Justice Williamson's decree.

■■■ I. Critical to the determination of whether or not these claimants had a compensable interest in the land taken in this proceeding by virtue of the restrictive covenants in their deeds is the meaning of the term "property" as used in the Fifth Amendment to the United States Constitution, which provides: " * * * nor shall private property be taken for public use, without just compensation." U.S.Const. amend. V. It has long been settled that the protection of this provision is limited to takings of "property." Kimball Laundry Co. v. United States, 338 U.S. 1, 5, 69 S. Ct. 1434, 93 L.Ed. 1765 (1949). However, it is equally clear that the term "property" is to be broadly interpreted. As the Supreme Court has stated, the conception of "property" in its constitutional sense "denote(s) the group of rights inhering to the citizen's relation to the physical thing, as the right to possess, use and dispose of it. * * * (I)t deals with * * * the individual's 'interest' in the thing in question. * * * *The constitutional provision is addressed to every sort of interest the citizen may possess.*" (Emphasis added.) United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). It has also been authoritatively determined that "Though the meaning of 'property' as used * * * in the Fifth Amendment is a federal question, it will normally obtain its content by reference to local law." United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 279, 63 S.Ct. 1047, 1054, 87 L.Ed. 1390 (1943); United States v. Causby, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946).

■■ When we look to local law in the present case, we find that Chief Justice Williamson has characterized the interests of these claimants *vis-a-vis* the land of the Roman Catholic Bishop of Portland condemned by the government in this proceeding as valid restrictive covenants, so-called equitable easements, constituting "property rights." The government correctly points out that this conclusion, not being necessary to the resolution of the issues before the Chief Justice, is not technically binding on it in this proceeding, under principles either of res judicata or of collateral estoppel. Partmar Corp. v. Paramount Picture Theatres Corp., 347 U.S. 89, 91, 74 S.Ct. 414, 98 L.Ed. 532 (1954); Cromwell v. County of Sac, 94 U.S. (4 Otto) 351, 352–58, 24 L.Ed. 195 (1876); 1 Moore, Federal Practice para. 0.401 at 4022–23 (2d ed. 1961). Nevertheless, this Court accepts the Chief Justice's ruling as a correct statement of the Maine law and one which has a logical basis. The Maine court has long recognized that restrictive covenants create enforceable rights, which have been variously characterized as negative easements and as servitudes in the nature of easements. Leader v. LaFlamme, 111 Me. 242, 88 A. 859 (1913); Herrick v. Marshall, 66 Me. 435 (1877). Under Maine law such a covenant runs with the land for the benefit of successive grantees of the dominant estate, any one of whom may maintain an action in equity for its enforcement. Caron v. Margolin, 128 Me. 339, 343, 147 A. 419 (1929). With respect to the effect of restrictive covenants in a development, the Maine court has further stated that they were "for the benefit of *all the lots* and would run with *each lot* in the hands of the grantees of the [subdivider] and in the hands of subsequent grantees." (Emphasis added.) Leader v. LaFlamme, supra, 111 Me. at 245,[3] 88 A. at 861. In sum, this Court has no doubt as to the correctness of the Chief Justice's con-

3. There is no suggestion in the Maine cases that the relative times of acquisition have any bearing on these rights. However, in situations similar to the present one,

clusion that under Maine law the lots acquired by the government in this proceeding from the Roman Catholic Bishop of Portland were burdened by an equitable servitude in favor of the remaining lots owned by the present claimants, and that this equitable servitude constituted a property right which was extinguished by the government's taking.

■■ The authorities are divided on the question of whether the extinguishment of an equitable servitude is a taking of private property for which federal and state constitutional provisions require that compensation be paid when the land to which it is attached is taken for public use. The state decisions are in hopeless and irreconcilable conflict, although the majority view favors compensation.[4] The federal rule has not yet been authoritatively settled. In two early federal cases, United States v. Certain Lands in Town of Jamestown, 112 Fed. 622 (C.C.R.I.1899), aff'd sub nom., Wharton v. United States, 153 Fed. 876 (1st Cir. 1907), and Moses v. Hazen, 63 App.D.C. 104, 69 F.2d 842 (1934), the courts found that the restrictions had not been violated by the government's intended use of the land, but indicated in addition that the interests involved were not true interests in land for which compensation must be paid. See 112 F. at 627–30; 153 F. at 878; 69 F. 2d at 844. On the other hand, it now seems clear that equitable servitudes created by restrictive covenants are recognized as property rights under federal law. "Such 'equitable restrictions' are real estate, part and parcel of the land to which they are attached and pass by conveyance. * * * A contractual restriction which limits the use one may make of his own lands in favor of another and his lands is * * * an interest in lands which can pass only by deed and is

in every legal sense an incumbrance." Chapman v. Sheridan-Wyoming Coal Co., 338 U.S. 621, 627, 70 S.Ct. 392, 395, 94 L.Ed. 393 (1950) (dictum). And the only recent federal cases which have dealt with the question have treated the rights created by such restrictions as compensable property interests in the context of federal eminent domain proceedings. Adaman Mut. Water Co. v. United States, 278 F.2d 842 (9th Cir. 1960); United States v. 11.06 Acres of Land, 89 F.Supp. 852 (E.D.Mo.1950). This is the view adopted by the commentators and by the American Law Institute. 2 American Law of Property, op. cit. supra §§ 9.24 and 9.40; Restatement, Property §§ 539, comment a and 566 (1944); Comment, Real Property—Compensation for Abrogation of a Restrictive Covenant by Public Authority, 53 Mich.L.Rev. 451 (1955). It is likewise the view of this Court, which is in complete agreement with the analysis set forth in 2 American Law of Property, op. cit. supra § 9.40. As is there pointed out, the holdings of those cases which deny compensation rest upon one or both of two essentially untenable propositions: first, that a restrictive covenant does not create a type of property interest known to the common law and therefore does not give rise to an interest for the extinguishment of which compensation must be paid; and second, that a restrictive covenant is illegal and void insofar as it applies against a governmental use and thereby burdens the power of eminent domain. On the other hand,

"* * * (t)he better reasoned authorities have held that the extinguishment of an equitable servitude under the power of eminent domain is the taking of private proverty for public use for which compensation must be paid. These cases clearly

---

in which the deeds to the claimants antedated the deed to the Bishop, the courts have consistently held, despite the analytical difficulties presented, that a prior purchaser has an enforceable right against those subsequently acquiring land from the original grantor, the most wide-

ly accepted basis being the existence of an "implied reciprocal servitude." 2 American Law of Property §§ 9.30, 9.34 (1952).

4. The cases are collected in 2 Nichols, Eminent Domain § 5.73 (3d ed. 1950).

turn on the premise that the enforcement in equity of covenants and agreements running with the land is the recognition of their existence as equitable property interests of a nature similar to legal easements, and that such property interests are compensable in the exercise of the power of eminent domain. In some of these cases the courts have indicated the fallacy in the argument that building restrictions are void as to the government because they interfere with the exercise of a governmental function, by pointing out that they do not prevent the exercise of the governmental function but merely require compensation to be paid for their infringement." 2 American Law of Property, op. cit. supra § 9.40 at 449.[5]

With respect to the first question presented, the Court concludes that the claimants did have a compensable interest in the land taken in this proceeding by virtue of the restrictive covenants in their deeds.

 II. As to the measure of the compensation to be paid to the claimants in this proceeding, the Court will instruct the jury that they are entitled to be compensated for the diminution in the value of their lots as a result of the extinguishment of the equitable servitude in the land taken by the government.[6] United States v. 11.06 Acres of Land, supra 89 F.Supp. at 860, 861; 2 American Law of Property, op. cit. supra § 9.40 at 450. Under accepted principles, the jury will be instructed that such diminution is to be measured by the difference in the fair market value of their property immediately before and immediately after the taking. United States v. 11.06 Acres of Land, supra.

III. With respect to the third question which the parties have asked the Court to resolve at this time, the Court is unable to say, on the basis of the record presently before it, whether or not the so-called "Pond" area as shown on the Plan was dedicated as a pond for the benefit of the numbered lots. Under Maine law, as elsewhere, dedication turns primarily upon the intent of the owner of the property. Northport Wesleyan Grove Camp Meeting Ass'n v. Andrews, 104 Me. 342, 71 A. 1027, 20 L.R.A.,N.S., 976 (1908). The stipulation of facts is barren of any evidence from which such intent can be determined.

---

5. In view of the development of the law in the intervening years, this Court does not feel bound by the remarks of the Court of Appeals in Wharton v. United States, supra, which were clearly pure dicta to the extent that they included comment upon the problem here presented.

6. Since, as noted above, the deed to Lot 18 and the southerly half of Lot 16 contained no restriction, the claimant Helen F. Bragg is not entitled to any compensation for any diminution in the value of this property resulting from the government taking.