ARK. STATE HIGHWAY COMM. *v.* McNEILL.

5-3274                                    381 S. W. 2d 425

Opinion delivered June 1, 1964.

[Rehearing denied September 14, 1964.]

*Mark E. Woolsey* and *Don Langston,* for appellant.

*Hardin, Barton & Jesson,* for appellee.

GEORGE ROSE SMITH, J. This is a suit by the appellees, Troy McNeill and his wife, to enjoin the State Highway Commission from constructing a cloverleaf interchange upon a highway near the McNeills' home, unless the Commission first files a bond to secure any damages that the McNeills may suffer as a result of the construction. The Commission contends that the presence of the completed interchange will not cause any legally compensable damage to the plaintiffs. The chancellor, rejecting this defense, granted the injunction but withheld any determination of the McNeills' damages until the principal question has been decided by this court.

The McNeills own a residence in Crestview Estates, an addition to Fort Smith. The Crestview bill of assurances provides that property in the addition shall be used only for residential purposes. The highway department does not propose to take any of the appellees' land. It is, however, acquiring a tract that is comprised of eleven lots within the addition and that abuts the appellees' north boundary line. When the interchange is

completed the area behind the McNeills' home will be a busy highway instead of a quiet residential district. Expert witnesses testified that this transition will diminish the value of the plaintiffs' property by $10,000 or more.

In their complaint the McNeills bottomed their right to damages upon two separate grounds: First, the value of their property would be reduced by the presence of the highway, with its attendant noise, dust, fumes, glaring lights, and vibration. Secondly, the value of their property would be reduced by the highway department's violation of the residential restriction contained in the bill of assurances. The chancellor rejected the first count in the complaint but upheld the second count.

There is no appeal from the trial court's denial of compensation upon the first count. In fact, in the oral argument counsel for the landowners candidly conceded that this count does not state a cause of action. Despite the fact that the merits of the first count are not now in issue we think it best to begin our discussion by considering this count, for our decision upon the main question is really based upon the lack of merit in the first count.

It is well settled in Arkansas that a landowner whose land is not being taken is not entitled to compensation for damage of the same kind as that suffered by the public in general, even though the inconvenience and injury to the particular landowner may be greater in degree than that to others. *Hot Springs R. R.* v. *Williamson,* 45 Ark. 429, aff'd 136 U. S. 121, 34 L. Ed. 335, 10 S. Ct. 955; *Little Rock & H. S. W. R. R.* v. *Newman,* 73 Ark. 1, 83 S. W. 653. On the other hand, a compensable injury occurs when there is a special damage to the plaintiff, as by a change in the grade of the street abutting his property or by a destruction of his access to a public street. *Campbell* v. *Ark. State Highway Comm.,* 183 Ark. 780, 38 S. W. 2d 753.

It cannot be doubted that the first count in the McNeills' complaint does not state a cause of action. They merely assert that after the project has been com-

pleted their back property line will border a public highway rather than a privately owned residential lot. Such an inconvenience is of the same nature as that suffered by the public in general whenever a highway is built in a residential district. There is no cause of action in the landowner for the resulting diminution in the value of his property.

We turn to the principal issue: Does the fact that the proposed interchange will violate the restrictive covenant render the appellant liable for the decrease in the market value of the McNeills' property? This problem has arisen in some twenty jurisdictions, with the decisions about equally divided between the allowance of compensation and its denial. The cases are discussed in Nichols, Eminent Domain (3d Ed.), § 5.73, and in a Comment, 53 Mich. L. Rev. 451. When compensation is allowed it is ordinarily measured by the diminution in market value. *U. S.* v. *Certain Land in the City of Augusta,* D. C. Maine, 220 F. Supp. 696; *U. S.* v. *11.06 Acres,* D. C. Mo., 89 F. Supp. 852; *Town of Stamford* v. *Vuono,* 108 Conn. 359, 143 Atl. 245; *Johnstone* v. *Detroit, G. H. & M. R. R.,* 245 Mich. 65, 222 N. W. 325. The American Law Institute indicates that compensation may be proper in some instances, but it refuses to express any opinion about the correct measure of damages. Restatement, Property, § 566.

Many of the decisions denying compensation are discussed in *Anderson* v. *Lynch,* 188 Ga. 154, 3 S. E. 2d 85. The courts seem to have had some difficulty in finding a sound basis for refusing an award, some saying that the plaintiff has no property interest in the land being taken, others that the restrictive covenant does not confer a property right, and still others that the public power of eminent domain should not be impaired by private contract.

We have no quarrel with an award of compensation if, as in Missouri, the same award would have been made if there had been no restrictive covenant. *Peters* v. *Buckner,* 288 Mo. 618, 232 S. W. 1024, 17 A.L.R. 543. But, as

we have seen in considering the first count in the appellees' complaint, that is not the law in Arkansas. Any cause of action asserted by the McNeills must rest solely upon the breach of the restriction.

In those jurisdictions where, as here, compensation would be denied in the absence of a restriction, the decisions approving an award on the basis of the restriction alone are, in our opinion, demonstrably wrong. We need not, however, adopt the somewhat dubious reasons that have been given for the denial of compensation. We think the problem is essentially a simple one in causation.

It seems almost too plain for argument that the reduction in the value of the McNeills' property is attributable not to the breach of the restriction but rather to the fact that a highway is about to pass through a residential district. Suppose, for example, that this addition, Crestview Estates, had been developed in exactly the same way that it was actually developed, as a residential district, but without any such restriction in the bill of assurances. If the interchange had then been constructed the McNeills' damage, as far as the pleadings and proof indicate, would have been the same to the penny as if the restriction had existed. Yet it would not have been compensable. Thus it is illogical to permit a recovery upon the theory that the breach of covenant is the proximate cause of the injury.

Another illustration to demonstrate the fallacy in the decisions allowing compensation: Assume the existence of a purely residential area that is in part restricted and in part unrestricted. If a highway should be constructed just within the restricted section the landowners on that side of the highway would receive compensation while those on the other side, although suffering identical damage, would be without a remedy. Under such a rule it is evident that whenever the owners of property in an unrestricted neighborhood learn that a throughway is coming in their direction it is to their advantage to enter into an agreement imposing restrictions. In that way, by merely signing a piece of paper which they may de-

stroy at will, they are able to pluck valuable causes of action from the thin air.

We do not deny the existence of a property right in the appellees. It may be that the restrictive covenant gave added value to their land when they bought it. But it is not the breach of the covenant alone that is causing their damage. This same tract, instead of being taken for a highway, might have been condemned by the city as a site for a public park. That too would have involved a breach of covenant, but the value of the appellees' property might actually have been enhanced. Thus there is no logical basis for attributing the appellees' present damage to the naked breach of covenant. Even without the restriction their injury would still have occurred. We cannot permit an irrelevant clause in the bill of assurances to create a fictitious cause of action.

Reversed and dismissed.

McFADDIN, J., dissents.

ED. F. McFADDIN, Associate Justice (dissenting). I respectfully but vigorously dissent because, as I see it, a valuable property right is being taken from the appellees by the State Highway Commission and this Court is refusing to allow the appellees any compensation for such valuable property right, and all this in spite of Art. 2, § 22 of our Constitution, which says: ''The right of property is before and higher than any constitutional sanction; and private property shall not be taken, appropriated or damaged for public use, without just compensation therefor.''

In 1955 an exclusive residential addition was developed in Fort Smith called ''Crestview Estates Addition,'' and the bill of assurances under which each lot in the district was sold contained these provisions, *inter alia:*

''1. No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached single-family dwelling not to exceed two and one half

stories in height; and a private garage; and one other detached accessory building of not over one story in height and architecturally harmonious to the dwelling structure.

"7. No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.

"11. These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of twenty-five years from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of 10 years unless an instrument signed by a majority of the then owners of the lots has been recorded, agreeing to change said covenants in whole or in part. Enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any covenant either to restrain violation or to recover damages.

"12. These covenants and restrictions shall be deemed to be incorporated in every deed of the owners to any and all lots located in said addition."

Every lot in Crestview was bound by the restrictive covenants above recited, one of which was that no lot would be used for any purpose except for a residence. Naturally, this restrictive covenant rendered the lots most valuable for residential purposes. In 1957 the appellees, Mr. and Mrs. McNeill, purchased a lot and a half in Crestview and erected thereon their home in which they now live. In 1962 the Arkansas State Highway Commission purchased, by warranty deed, eleven lots in said Crestview Addition, and each lot was bound by the restrictive covenant that no lot would be used except for a residence.

The Arkansas State Highway Commission purchased these lots for the deliberate use of a highway and not for residential purposes, thus deliberately intending

to violate the said restrictive covenant on each lot. Is the State and its agencies above the law and superior to the rights of private persons? The Constitution answers this question in the negative in the quotation I have above given. I think the Sovereign should deal fairly with its subjects, and I decry any attempt to allow the Sovereign to buy property like a private person and then claim rights superior to private persons.

The Majority Opinion says this is the issue: "Does the fact that the proposed interchange will violate the restrictive covenant render the appellant liable for the decrease in the market value of the McNeill property?" I unhesitatingly answer this question in the affirmative. A restrictive covenant such as we have here is a property right. Such was impliedly recognized in *Linder Corp.* v. *Pyeatt*, 222 Ark. 949, 264 S. W. 2d 619. See also 14 Am. Jur. 609, "Covenants" § 194. So the appellees have a property right that has been damaged. That the appellees are suffering damages different from the general public seems to me to be crystal clear. Any person owning a lot in Crestview had a property right against every other lot in Crestview. The general public had no such right: the restriction was owned only by lot owners in Crestview; and that, to my way of thinking, distinguishes lot owners in Crestview from the general public.

So I disagree entirely with the Majority Opinion which says that the lot owners in Crestview suffered only damages the same as the general public. Every lot owner in Crestview had bought a lot, knowing he had a restrictive covenant against every other lot. Suppose somebody had bought eleven lots in Crestview for a supermarket. Would this Court hold that the McNeills had no right for damages? Why should the State Highway Commission, acquiring property by deed, have a greater right than a citizen would have who acquired by deed? I respectfully dissent.

I might close this dissent at this point; but the learned Chancellor wrote a 30-page opinion in this case, and it shows such tremendous research that I now copy

extensively from it so that anyone studying this question in the future will have the benefit of the Chancellor's opinion:

## COPIED FROM THE CHANCELLOR'S OPINION

As to the claim of plaintiffs that defendants are violating the restrictive covenants in the Bill of Assurance to the compensable damage of their property, the defendants cite *Gremillion* v. *Rapides Parish School Board,* 134 So. 2d 700, in which court reviewed the split of authority. The result of this review reflected that the States of New Jersey, New York, Connecticut, North Carolina, Massachusetts, Michigan, Missouri, Tennessee, Virginia, and Wisconsin, through their respective Supreme Courts, were in accord that a restrictive covenant, such as the one in this case, was a property right and interest which when destroyed resulting in damage was compensable. The Courts of the States of California, Colorado, District of Columbia, Georgia, Florida, Ohio, Texas, West Virginia, and Louisiana hold otherwise.

The majority of courts have held that a person in whose favor a restrictive covenant exists has a compensable interest in a condemnation proceeding which prevents compliance with the restrictions. In 2 Nichols on Eminent Domain, Sec. 5.74 it is stated:

"The majority view holds that such a restriction often characterized as an equitable servitude, constitutes property in the constitutional sense and must be compensated for if taken. Such restrictions constitute equitable easements in the land restricted, and when such land is taken for a public use that will violate the restrictions, there is a taking of the property of the owners of the land for the benefit of which the restrictions were imposed. The owners of such property cannot maintain proceedings for damages against the original owner or enforce the restrictions against the condemnor, but they are entitled to an award of compensation for the destruction of their easements.

"If the existence of the easement diminished the value of the land subject thereto, as is ordinarily the

case when the easement is of such a character as a right of way, the compensation of the holder of the easement might well be deducted from the sum awarded to the owner of the servient tenement. In the case of mutual building restrictions, however, the existence of the restrictions often enhances rather than decreases the value of the land, and the owner of the land taken might consequently well object to receiving in any event less than fair market value of his property as a place of real estate.''

The majority cases stand on a much stronger footing, both from a logical as well as a legal viewpoint.

One of the early leading cases in this field is that of *Johnstone* v. *Detroit C. H. & M. Ry. Co.,* 222 N. W. 325 (1928). There the Supreme Court of Michigan held that owners of property within a restricted subdivision whose property was not actually taken were nevertheless entitled to compensation upon a taking of a portion of the subdivision for railroad purposes. The Court held that compensation for destruction of building restrictions in acquiring the land through the subdivision for the railroad was measured by diminution in value of the land not taken. In *Johnstone* the court discussed the various cases on this point prior to that time including those cases which held that where the condemnation was for public use that the public body was not subject to the building restrictions. In rejecting this view the Michigan court stated:·

''We cannot approve the application made in these cases of doctrine of public policy. The usual conveyance or contract affecting real estate contemplates its use by persons to the exclusion of all other persons and the public. In the right of use lies its value. The reasoning pursued, by reading the exclusive purpose out of the instrument as illegal, would read into it an exception of public use. In direct point, it would enable the state to destroy a common-law negative easement of light, air, and prospect without compensation. By analogy, it would deny payment for the destruction of an easement of way,

an unexpired rental term, increased values due to attractive leases or uses, and, if pursued to its conclusion, injury to the residue of a freehold when part is taken. All the authorities agree that these interests are compensable.

"Especially as applied to residence restrictions is the syllogism unacceptable. Restrictions for residence purposes, if clearly established by proper instruments, are favored by definite public policy. The Courts have long and vigorously enforced them by specific mandate. * * *

"Nor is there anything in our laws, system of government, or the spirit of our institutions which curtails the genius of a citizen in creating or enhancing values in his property in any lawful way, by physical improvement, psychological inducement, contract, or otherwise. His obligation to recognize the power of eminent domain and the possibility of its exercise in no wise restricts his right to legitimate profit. He may view the power in its constitutional entirety, with comitant requisite of just compensation, and order his affairs within the law with assurance that, if the state takes his property it will pay him the value of what it takes, of whatever that value may consist, so it is measured by the market. Anything less is confiscation.

* * *

"It is therefore held that owners of property in a subdivision in which, under a general plan, the property is restricted to specified uses, and in which the restrictions are valid, subsisting, and enforceable against the lands in the hands of private owners, are entitled to compensation upon the taking of any part of such subdivision for public use in violation of such restrictions; that, aside from nominal damages for destruction of the easement, the compensation is measured by the actual diminution in value of the premises of such owner as a result of the use to which the property taken is put, and that, in determining such diminution, the effect by way of benefit as well as by way of injury, of such use is to be taken into account."

In *Peters* v. *Buckner, Judge,* 232 S. W. 1024 (Mo. 1921) the court held that a grantee of a lot in a subdivision, the deeds to all the lots which contain a covenant against the erection of buildings for other than residential purposes, has an easement in and to every lot in the subdivision which is also covered by the covenant and that this easement is appurtenant to his lot for the enforcement of such covenant. The court further held that the easement of the owner of a lot in a subdivision in each lot is property which cannot be taken for public use without compensation. In the *Peters* case the Supreme Court of Missouri stated:

"There can be no doubt but what the erection of the schoolhouse on the lots mentioned in this case is, in spirit, a violation of the covenants of restrictions mentioned in the deeds of the Meadow Park Addition to Kansas City to the various purchasers of lots therein. While these restrictions are not binding upon the state or the school board, acting under the state's authority in such condemnation proceedings, yet, if such restrictions add actual value to all the lots of the addition, it should be protected by the courts of the state; then, when the school board undertakes to deprive the owners of those lots of those values, by condemnation proceedings, it should be required to pay for the same, as for all other values it takes from the property owners of the addition by such proceedings, and that, too, before their property can be taken or damaged, as before indicated."

*City of Raleigh* v. *Edwards,* 71 S. E. 2d 396 (N. C. 1952), involved a proceeding by the City against the defendant and others to condemn certain lots within the City as the site for the erection of an elevated water storage tank. An adjoining landowner intervened alleging that the erection of the proposed water tank would impair the value of his property by depriving him of the benefits of existing covenants restricting the use of the property sought to be condemned to private dwelling purposes only. The North Carolina Supreme Court

held that the restrictive covenants contained in the deeds to the lots in the subdivision wherein the water tank was to be erected vested in the interveners a property right in the land sought to be condemned which must be paid for. This was the first time this question had been presented to a North Carolina court and the court discussed the underlying principles and basic decisions in this field in the following language:

"The question whether the restrictive covenants contained in the deeds to the lots in the subdivision vested in the interveners a property right in the land sought to be condemned which must be paid for. This precise question does not seem to have been presented heretofore to this Court for determination, and the decisions from other jurisdictions reflect a contrariety of opinion.

"However, the decided weight of authority in other jurisdictions supports the proposition that such a restriction, being in the nature of an equitable servitude, is an interest in land and must be paid for when taken. The theory is that these restrictions impose negative easements on the land restricted in favor of and appendant to the rest of the land in the restricted area, and when a particular parcel thereof is appropriated for a public use that will violate the restrictions, such appropriation amounts in a constitutional sense to a taking or damaging of property of other landowners for whose benefit the restrictions are imposed. 18 Am. Jur., Eminent Domain, Sec. 157, p. 788. Annotations: 17 A.L.R. 554; 67 A.L.R. 385; 122 A.L.R. 1464.

"It is true that such other landowners may not enforce the restrictions against the condemnor, but they are nonetheless entitled to an award of compensation where, through the exercise of the power of eminent domain, there is a taking or damaging of such property rights * * *. 18 A. Jur., Eminent Domain, Sec. 157, p. 788. See *Peters* v. *Buckner*, 288 Mo. 618, 232 S. W. 1024, 17 A.L.R. 543; *Flynn* v. *New York etc. R. Co.*, 218 N. Y. 140, 112 N. E. 913; *Allen* v. *City of Detroit*, 167 Mich. 464, 133 N. W. 317, 36 L.R.A. N.S. 890; *Town of Stam-*

*ford* v. *Buono,* 108 Conn. 359, 143 A. 245. (Citing other cases.)

"In *Flynn* v. *New York, etc. R. Co., supra,* it was held by the New York Court that where a railroad company bought lots in a tract of land which was subject to restrictions, including a prohibition against the erection of any structure for business purposes, and built and maintained thereon an electric railroad, there was a deprivation of property rights entitling the other lot owners in the tract to compensation.

"In *Allen* v. *Detroit, supra* (167 Mich. 464, 133 N. W. 320), the Michigan Court held that the erection by a city of a fire engine house on property purchased by it, but restricted to residential purposes, was a taking of private property for public use and the owners of the lots for the benefit of which the restriction was imposed were entitled to compensation. The Court said: 'Building restrictions are private property, an interest in real estate in the nature of an easement go with the land, and a property right of value, which cannot be taken for the public use without due process of law and compensation therefor; * * *'

"The decisions representing the minority view rest for the most part on the theory that since all property is held subject to the power of eminent domain, the rights of the Sovereign or condemnor are impliedly excepted from the operation of these restrictive covenants; and that if not so excepted, the condemnor, not being party or privy to the contract creating the covenants, no action for damages will be against the condemnor. See 18 Am. Jur., Eminent Domain, Sec. 157, p. 677, footnote 20. Thus, in the final analysis the minority view is grounded on the theory that these restrictions, being contractual rights enforceable in equity only between parties in privy, do not constitute an interest in property at all. See Nichols on Eminent Domain, 3d Edition, Vol. 2, Sec. 5,73, pp. 72 and 83.

"On the other hand, the majority view rests squarely upon the theory that a negative easement created by

a building restriction is a vested interest in land (18 Am. Jur., Eminent Domain, Sec. 157, p. 788), and this Court has adhered unvaryingly to the principle that a negative easement of this kind is a vested interest in land. *McKinney* v. *Deneen,* 231 N. C. 540, 58 S. E. 2d 107; *Hildebrand* v. *Southern Bell Telephone & Telegraph Co.,* 219 N. C. 402, 14 S. E. 2d 252; *City of Charlotte* v. *Heath,* 226 N. C. 750, 40 S. E. 2d 600 (here it was conceded by all parties concerned that the negative easements involved were property rights to be condemned and paid for); *Turner* v. *Glenn,* 220 N. C. 620, 18 S. E. 2d 197; *Davis* v. *Robinson,* 189 N. C. 589, 127 S. E. 2d 697; *East Side Builders* v. *Brown,* 234 N. C. 517, 67 S. E. 2d 489. See also *Glenn* v. *Board of Education,* 210 N. C. 525, 187 S. E. 781; *Hiatt* v. *Greesboro, supra;* Mordecai's Law Lectures, 2d Edition, p. 557; Thompson on Real Estate, Permanent Edition, Vol. 7, Sec. 3620 through Sec. 3631; Clark, Covenants and Interests Running with Land, p. 174 et seq.

"In *Davis* v. *Robinson, supra,* 189 N. C. at page 598, 600, 127 S. E. at page 702, opinion by Varser, J. it. is said: 'Easements are classified as affirmative or negative. "Negative easements are those where the owner of a servient estate is prohibited from doing something otherwise lawful upon his estate." * * * "An easement always implies an interest in the land. * * * It is real property, and it is created by grant." A building restriction is a negative easement.'

"In *Turner* v. *Glenn, supra,* 220 N. C. at page 625, 18 S. E. 2d at page 201, with Barnhill, J., speaking for the Court, it is said: 'The servitude imposed by restrictive covenants is a species of incorporeal right. It restrains the owner of the servient estate from making certain use of his property. It is an interest in land, conveyance of which is within the statute of frauds.'

"Thus, holding as we do that these negative easements are vested property rights, it follows by force of natural logic and simple justice that for the taking of such property just compensation must be paid as in

the case of the taking of any other type of property, and the lack of contractual privity between the owners and the condemnor is in no sense a determinative factor.

"Treating the allegations of the further defense as true, as is the rule on demurrer, *Hall* v. *Coble Dairies,* 234 N. C. 206, 67 S. E. 2d 63, we conclude that the interveners have a vested property right of value in the restrictions imposed on the lots sought to be condemned and that the proposed use of the property amounts in a constituional sense to a taking or damaging of this property right, for which the interveners are entitled to compensation commensurate with any loss they may sustain. Art. 1, Sec. 17 of the Constitution of North Carolina; Fifth Amendment of the Constitution of the United States."

In *Meagher* v. *Appalachian Electric Power Co.,* 77 S. E. 2d 461 (1953), the Virginia Supreme Court of Appeals faced this question for the first time. This was a suit involving the erection of high voltage transmission tower lines in violation of restrictive covenants binding upon the lands of the plaintiff and the defendant. There the court held that the restrictive covenant applicable to all of the lots in the subdivision was a property right in favor of those for whose benefit it was imposed, and that a public service corporation invading such property right because of public necessity must compensate those for whose benefit the covenant was imposed. In *Meagher* the court decided this question by using the following language:

"The next question is whether the restrictive covenants applicable to all of the lots in the subdivisions are a property right in favor of those for whose benefit they were imposed. The precise question has not heretofore been presented to this court and the decisions from other jurisdictions are in conflict. In the recent case of *City of Raleigh* v. *Edwards,* 235 N. C. 671, 71 S. E. 2d 396, 397, there is a clear and concise discussion of the subject. There the City of Raleigh instituted condemnation proceedings to acquire property in a subdivision for the

erection of a water tower. Several property owners in the subdivision intervened and asserted the claim that the proposed public improvement was in violation of the covenants restricting the use of the property in the subdivision to 'private dwelling purposes only,' and would deprive them of vested property rights of substantial value created by such covenants, and entitle them to compensation therefor. After a careful review of the authorities the court thus expressed its agreement with that view:

'* * * the decided weight of authority in other jurisdictions supports the proposition that such a restriction, being in the nature of an equitable servitude, is an interest in land and must be paid for when taken. The theory is that these restrictions impose negative easements on the land restricted in favor of and appendant to the rest of the land in the restricted area, and when a particular parcel thereof is appropriated for a public use that will violate the restrictions, such appropriation amounts in a constitutional sense to a taking or damaging of property of the other landowners for whose benefit the restrictions are imposed. 18 Am. Jur., Eminent Domain, Sec. 157, p. 788; Annotations: 17 A. L. R. 554; 67 A. L. R. 385; 122 A. L. R. 1464.

"The North Carolina court declined to follow the minority view which, it said, 'is grounded on the theory that these restrictions, being contractual rights enforceable in equity only between parties in privy, do not constitute an interest in property at all.' 71 S. E. 2d at page 401.

"Among other authorities taking the majority view are, *Ladd* v. *City of Boston*, 151 Mass. 585, 24 N. E. 858, 21 Am. St. Rep. 481 (opinion by Holmes, J.); *Riverbank Improvement Co.* v. *Chadwick*, 228 Mass. 242, 117 N. E. 244, L. R. A. 1918B, 55; *Johnstone* v. *Detroit Elec. R. Co.*, 245 Mich. 65, 222 N. W. 325, 67 A. L. R. 373; *Peters* v. *Buckner*, 288 Mo. 618, 232 S. W. 1024, 17 A. L. R. 543; *Flynn* v. *New York, etc. R. Co.*, 218 N. Y. 140, 112 N. E. 913, Ann. Cas. 1918B, 588. See also, Nichols' The Law of Eminent Domain, 3d Ed., Vol. 12, Sec. 5.73, pp. 81-84.

"A leading case presenting the minority view is *Anderson* v. *Lynch,* 188 Ga. 154, 3 S. E. 2d 85, 122 A. L. R. 1456, where the principal authorities relied upon by the defendant here are collected.

"Our previous decisions have clearly indicated that restrictive covenants create a valuable right in property. In *Spilling* v. *Hutcheson,* 111 Va. 179, 183, 68 S. E. 250, we approved the statement in 2 Pomeroy's Equity Jur., 3d Ed. Sec. 1342, that 'restrictive covenants in deeds * * * limiting the use of land in a specific manner, or prescribing a peculiar use, * * * create equitable servitudes on the land.'

"In *Cheatham* v. *Taylor,* 148 Va. 26, 39, 138 S. E. 545, we said 'that the right of a third person to the protection of the (restrictive) covenant is an equitable right by whatever named called.'

"In *Springer* v. *Gaddy,* 172 Va. 533, 541, 2 S. E. 2d 355, 358, we approved the holding that the right under such a restrictive covenant is 'a negative equitable easement.' But whatever may be its correct designation, we are of opinion that such restrictive covenants created an 'interest or estate' in land, which a public utility may acquire by eminent domain, Code, Sec. 25-8, but subject to the protection of Section 58 of the Constitution that it may not 'be taken or damaged for public uses, without just compensation.'

"It is argued that such restrictions cannot be invoked against a public service corporation clothed under the laws of the State with the power of eminent domain, because public necessity may require the taking of property in such an area despite such restrictions. The answer is, that 'Public necessity may justify the taking, but cannot justify the taking without compensation.' *City of Raleigh* v. *Edwards, supra,* 71 S. E. 2d at page 399.

"We are of opinion, then, that the acts of the defendant are a breach of the covenants and restrictions binding on its lands in these subdivisions, and constitute a taking or damaging of property rights for which compensation must be paid.

"Injunction is the proper remedy to prevent the taking or damaging of private property for a public use without just compensation by one who is invested with the power of eminent domain. *Virginia Hot Springs Co. v. Lowman*, 126 Va. 424, 427, 101 S. E. 326; *Nichols v. Central Virginia Power Co.*, 143 Va. 405, 413-415, 130 S. E. 764, 44 A. L. R. 727; 30 C. J. S., Eminent Domain, Sec. 405, p. 125."

One of the most recent cases involving this question is that of City of *Shelbyville* v. *Kilpatrick*, 322 S. W. 2d 203 (Tenn. 1959). There, the City brought a suit for declaratory judgment that it could erect a city water tower in a residential subdivision without paying compensation to other lot owners in the subdivision. The court held that where the recorded plat of a subdivision provided that all lots in the addition were restricted to residential purposes only, and the City acquired one of the lots for the purpose of erecting a water tower thereon, that the proposed violation of the restriction by the City would be the taking by the City of the 'property' of the owners of the other lots, so that the City would be required by the Constitution to pay just compensation. The Tennessee Supreme Court used the following language in the Kilpatrick case:

"The exact question seems never to have been decided in this jurisdiction. As observed by the Chancellor, the decisions of other jurisdictions 'are in irreconcilable conflict.'

\* \* \*

"In view of the diametrically opposite views by eminent authorities on each side, it will not be amiss, at least in justification of the position taken by this Court, to state briefly the reasons attributed by each for the respective conclusions reached.

"A variance appears in the numerous decisions as to just what technical name should be given this restrictive covenant. All the decisions and textwriters, however, appear to agree in the conclusion that the reciprocal servitude owed by each lot to all the others in the sub-

division is an equitable easement; that this easement continues, with the exception (so some say) of the sovereign, into whosoever the respective dominant and servient estates may successively pass.

"The authorities likewise seem to agree upon the proposition that, as between individuals, the violation of the right created by this easement may be enjoined in equity by the owner of the dominant estate, or such owner may be entitled to compensation for its violation, all because it would be unconscionable to allow the owner of the servient estate to violate with impunity his contract creating this equitable easement.

"But when it comes to the question of whether the violation of this restriction by the sovereign in the taking of the servient lot by eminent domain (or by voluntary conveyance to it) for a public purpose those who say that it is not the taking of property within the meaning of the constitutional requirement mentioned place this conclusion upon the ground that the easement is not one which 'would permit the physical use or occupation thereof' by the other lot owners in the tract, 122 A. L. R. 1465, nor is it a 'true easement, as right of passage or rights to light and air, which are land and subject to condemnation as other interests in land.' 63 App. D. C. 104, 69 F. 2d 842, 844, 98 A. L. R. 389. Hence for each reason, no interest in land, they say, is taken.

"When it comes to the fact that those from whom the sovereign acquires the servient lot have agreed with the owner of every other lot in that subdivision to the easement in question, the above jurisdictions, or some of them, say that an individual cannot impose upon the sovereign 'the burden of compensating him for damage resulting from that public use which does not directly invade his land.' 17 A. L. R. 555, and that the parties may not 'in private contract create for themselves an estate in land not known to our law and thus entitle them to compensation where no such right existed before.' 122 A. L. R. 1465.

"Others upon that side go so far as to say that since the sovereign cannot be restricted in its use of the land for a public use, short of a nuisance, at least, it follows that an intention between the contracting parties not to include the sovereign will be implied. 188 Ga. 154, 3 S. E. 2d 85, 122 A. L. R. 1462.

"The contrary view is that when all the lots in a subdivision are subject to this restrictive easement, and one is taken for a public use, the owners of the other lots for whose benefit the restriction is imposed are entitled to compensation, if damaged, because such an easement constitutes an interest in the land upon which it is imposed.

"The Michigan case of *Johnstone* v. *Detroit, Grand Have, etc.,* 245 Mich. 65, 222 N. W. 325, 327, 67 A. L. R. 373, in taking this last stated view of the matter, discusses the question in quite some detail. In response to the argument that it is against public policy to apply such restrictive easements to the sovereign in the taking of land for a public use the Court pointed out that the police power is restrictive, only limiting the owner's use of property to public safety, etc. 'but never extends to depriving him of it for public benefit.'

"The Court recognized the fact that building restrictions 'did not constitute easement known to the common law.' But then called attention to the fact that the 'easements of light, air and access in property abutting on a public street is not a common law easement, but its impairment by public use in the street is a taking of property.'

"*Johnstone* v. *Detroit, etc., supra,* asserts that its holding 'is supported by the weight of authority.' The first annotation following the report of the case, after calling attention to the annotation in 17 A. L. R., supra, makes this statement: 'The few cases decided since the earlier annotation uphold the rule that compensation must be made where the taking of property under eminent domain violates building restrictions on the land adjacent thereto.'

"The reasoning of the cases holding that compensation must be made where the taking of property under eminent domain violates building restrictions placed thereon for the benefit of every other lot in the subdivision is, in the opinion of this Court, more consistent with the realities of the situation. Each of the respective owners of the respective lots entered into this restrictive agreement because each regarded it as something which added to the value of his or her own lot. Our case of *Ridley* v. *Haiman,* 164 Tenn. 239, 258, 47 S. W. 2d 750, 756, recognizes it to be a fact that such a restriction is 'an interest or right created by the deed itself,' meaning an interest or right in the servient lot.

"Certainly it is not within the spirit of our eminent domain law that such interest created by the deed may be taken away from its owner without compensation, if that owner is damaged. Not being within the spirit of the law, it ought not to be so held, unless required by the letter of the law. This Court finds nothing in the letter of our eminent domain law forbidding compensation to the owner under such circumstances. Nor is there anything in Article 1, Section 21, exhibiting an intention that this right in the servient lot may be taken by the sovereign without paying just compensation.

"It does not seem accurate to hold that the owner of the right to restrict the use of the servient lot to a certain use for the benefit of the dominant lot is not a property right in that servient lot. The only right, broadly speaking, that any owner of any real estate has in land is the right to use it. So, it would seem to follow that the ownership of the right to restrict the use of a given parcel of land to a certain use is, to that extent, a property right in that lot, for which, when deprived thereof, he should be compensated. Or, as better stated in *Johnstone* v. *Detroit, etc. supra,*—'as the right to restrict the use of real estate is an invasion of ownership, it would seem logical that it is done by virtue of a right or interest in such real estate.' "

In *Adaman Mutual Water Company* v. *United States,* 278 F. 2d 842 (ninth Circuit, 1960), the Federal Court discussed this problem by using the following language:

"Presently, a restrictive covenant is generally deemed a property right under federal law. *Chapman* v. *Sheridan-Wyoming Coal Co.,* 1950, 338 U. S. 621, 70 S. Ct. 392, 94 L. Ed. 393. We think it should be treated similarly in an eminent domain context where the purpose of the distinction between property interests and other rights is to differentiate losses directly connected with the land taken from losses comparatively more remote. It follows from this that any right or duty, benefit or burden, which moves or is transferred as one with either the land or an estate in it must be deemed an interest in that land and compensable upon condemnation of the fee. Because the transfer of these rights and duties are subject to legal principles different from those which govern the passing of other interests, a unique, direct connection with the land is established. This connection justifies the distinction mentioned above. Accordingly, we think that under the Fifth Amendment a restrictive covenant imposing a duty which runs with the land taken constitutes a compensable interest.

"The argument that an impermissible burden is put upon the power of eminent domain by a restrictive covenant is untenable. Why should a party receive compensation for an easement right which enhances the value of his property and yet be denied compensation for a right obtained by a restrictive covenant which similarly adds to the value of his holding? Both interests are directly connected to the land and we are unable to find a distinction between them which will justify dissimilar treatment at the hands of a condemning authority."

In the quotations from the above cited cases it is noted that one of the principal factors involved is a determination of whether or not the restrictive covenants actually run with the land or are contractual in nature between the parties. In the instant case there would seem to be little room for argument but that the restric-

tive covenants run with the land. Indeed, the Bill of Assurance creating the restrictive covenants specifically provides that they are to run with the land and are deemed to be incorporated in every deed of the owners of any and all lots located in the addition. Also, it should be noted that in Arkansas the rule is that a covenant which is beneficial or essential to the use of the land conveyed and which is expressly made binding upon the heirs, assigns or successors of the grantor, runs with the land. *Nordin* v. *May*, 188 F. 2d 411 (Eighth Circuit, 1951).

The Court has extended this opinion because of the primary importance of this litigation, not only to the plaintiff, but to all litigants similarly situated.

It is, therefore, the opinion and judgment of this Court that the restrictive covenants in the Bill of Assurance and extended into the deeds are property rights; that the acquisition of the eleven lots and the construction of the project thereon amounts in a constitutional sense to a taking or damaging of this property right, and the Court specifically finds and holds that as a direct result of the construction of this project in the Crestview Estates Subdivision by the defendants has materially and substantially damaged and diminished the market value of plaintiffs' property; and that the property so taken and damaged are compensable under the law of Eminent Domain and the Constitution of the State of Arkansas.